**RAILWAY LABOR EXECUTIVES' AS-SOCIATION and International Federation of Professional and Technical Engineers, Plaintiffs,**

v.

**BOSTON AND MAINE CORPORATION, Delaware & Hudson Railway Company, Maine Central Railroad Company, and Portland Terminal Company, Defendants.**

Civ. No. 86–0273 P.

United States District Court,
D. Maine.

July 8, 1987.

John O'B Clarke, Jr., Kimberly A. Madigan, Highsaw & Mahoney, Washington, D.C., Craig J. Rancourt, Biddeford, Me., for plaintiffs.

Ralph J. Moore, William F. Sheehan, Shea & Gardner, Washington, D.C., Charles S. Einsiedler, Jr., Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., for defendants.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

Plaintiffs, Railway Labor Executives' Association (RLEA)[1] and International Feder-

---

1. Plaintiff Railway Labor Executives' Association is a voluntary unincorporated association of the Chief Executive Officers of the following nineteen standard labor organizations repre-

ation of Professional and Technical Engineers (IFPTE), have brought this declaratory judgment action under 28 U.S.C. § 2201 against Defendants, Boston and Maine Corporation (B & M), Delaware & Hudson Railway Company (D & H), and Maine Central Railroad Company and its subsidiary Portland Terminal Company (MEC/PT) (collectively the Railroads), to invalidate certain notices served by the Railroads on IFPTE and the unions represented by RLEA under the Railway Labor Act (RLA), 45 U.S.C. §§ 151–163 (1982), and to prevent the Railroads from further pursuing these notices. The merits of the action are before the Court on Cross Motions for Summary Judgment.[2] Subject matter jurisdiction is predicated on 28 U.S.C. §§ 1331, 1337.

## I. UNDISPUTED MATERIAL FACTS

Defendants are carriers by railroad engaged in interstate commerce and subject to the provisions of the RLA. They are all owned by Guilford Transportation Industries, Inc., of North Billerica, Massachusetts. While in the midst of a separate labor dispute with the Brotherhood of Maintenance of Way Employes (BMWE),[3] the Railroads on May 24, 1986 simultaneously sent notices under section 6 of the RLA, 45 U.S.C. § 156, to fifty-one of the bargaining units which represent the Railroads' employees for purposes of collective bargaining under the RLA.[4] These section 6 notices have proposed a new "Standard Agreement" which would replace the parties' collective bargaining contracts with respect to rates of pay, rules, and working conditions. It is undisputed that the Standard Agreement represents an overweening transformation of the present contracts.

In these section 6 notices, the Railroads requested that the unions meet with the Railroads' representatives on various dates set initially by the Railroads as between June 17 and June 23. Contrary to the prior practice between the parties, these meetings were mass meetings at which the Railroads simultaneously addressed more than one labor organization. The Railroads also tape-recorded the conferences. Apparently nothing more was accomplished at these initial conferences other than a reading of the Standard Agreement. After this initial round of conferences, the United Transportation Union terminated its participation in the conferences and invoked the services of

---

senting virtually all organized railroad employees in the nation: American Railway Supervisors Association (Division of BRAC); American Train Dispatchers' Association; Brotherhood of Locomotive Engineers; Brotherhood of Maintenance of Way Employes; Brotherhood of Railroad Signalmen; Brotherhood of Railway, Airline and Steamship Clerks; Brotherhood Railway Carmen of the United States and Canada; Hotel Employees and Restaurant Employees International Union; International Association of Machinists and Aerospace Workers; International Brotherhood of Boilermakers and Blacksmiths; International Brotherhood of Electrical Workers; International Brotherhood of Firemen and Oilers; International Longshoremen's Association; National Marine Engineers' Beneficial Association; Railroad Yardmasters of America; Seafarers International Union of North America; Sheet Metal Workers' International Association; Transport Workers Union of America; and United Transportation Union.

**2.** The motions before the Court include: Defendants' Motion for Summary Judgment on all Counts in Plaintiffs' Complaint, filed December 1, 1986; Plaintiffs' Cross Motion for Partial Summary Judgment on Counts I and VII of its Complaint, filed December 17, 1986; Plaintiffs' Cross Motion for Summary Judgment on all Counts of its Complaint, filed January 30, 1987; and Defendants' Motion for Summary Judgment on its Counterclaim, filed April 23, 1987.

**3.** This dispute arose in 1984 but reached its apex in March 1986 when BMWE initiated a strike against MEC/PT and established pickets against MEC/PT, B & M, and D & H. BMWE's self-help efforts eventually extended beyond the confines of the Guilford System, culminating in the intervention by both the President and Congress. See *Railway Labor Executives' Ass'n v. Boston & Maine Corp.*, 808 F.2d 150, 152–56 (1st Cir.), aff'g in part, rev'g in part, 639 F.Supp., 1092 (D.Me.1986); *Brotherhood of Maintenance of Way Employees v. Guilford Transp. Indus.*, 803 F.2d 1228, 1229–30 (1st Cir.1986); *Maine Cent. R.R. v. Brotherhood of Maintenance of Way Employes*, 663 F.Supp. 425 (D.Me.1987); *Maine Cent. R.R. v. Brotherhood of Maintenance of Way Employes*, 657 F.Supp. 971 (D.Me.1987).

**4.** Section 6 notices were not served on the American Railway and Airway Supervisors Association (ARASA) representatives of supervisors in the Engineering Departments on D & H and MEC.

the National Mediation Board (NMB) under section 5 of the RLA, 45 U.S.C. § 155.

In letters dated July 2, the Railroads scheduled a second round of conferences for July 9, 10, or 11 at three different locations. Representatives of only ten of the fifty-one bargaining units attended this second round of conferences. The Railroads deemed those unions that failed to attend as having terminated their participation in the conferences and advised them of the termination by letter dated July 11, 1986. On the same day, the Railroads also terminated the conferences with regard to some of the unions that had participated in the second round of conferences; again, this notification was by letter. Thereafter, only the American Train Dispatchers Association (ATDA) met further with the Railroads. At the close of those conferences, the Railroads orally advised ATDA that they were terminating the conferences and confirmed this termination in letters dated July 31, 1986.

For purposes of this action, it is undisputed that all the unions, except allegedly the American Railway and Airway Supervisors Association (ARASA), a division of the Brotherhood of Railway, Airline and Steamship Clerks, Freight and Express Handlers (BRAC), for the Mechanical Department of D & H and IFPTE for B & M have made a timely request for the services of the NMB. To date, the NMB has not assigned a mediator to any of these requests.[5]

ARASA never attended any of the aforementioned conferences. Instead, on June 2, it responded to D & H's May 24 notice by requesting that any meeting be postponed until the last quarter of the year because of both the financial condition of the lodge and the previous delay regarding ARASA's section 6 notices covering similar issues. D & H responded on June 30 by letter and indicated that it considered the conferences terminated and that it would exercise self-help on July 1. On that date, it imposed

the Standard Agreement on all ARASA-represented employees on its property. On July 9, BRAC, on behalf of ARASA, requested the services of the NMB, a request which the NMB has acknowledged it received that same day.

Unlike ARASA, IFPTE did attend the first and second rounds of conferences. Thereafter, in a letter dated July 11, B & M terminated the conferences; IFPTE received this notification on July 12. On July 16, IFPTE requested the services of the NMB, a request which was received by the NMB on July 22 and which was docketed on July 23. Although IFPTE notified B & M of its intention to invoke mediation, B & M avers that it did not learn that IFPTE had invoked mediation until mid-August. On July 29, B & M notified IFPTE that it was exercising self-help effective July 30. On that date, B & M imposed the Standard Agreement on all IFPTE-represented employees on its property.

## II. THE ISSUES

Plaintiffs have placed essentially three different issues before the Court regarding the Railroads' May 24 section 6 notices. First, Plaintiffs seek a declaration that the implementation of the Standard Agreement against those workers represented by ARASA for the Mechanical Department of D & H and by IFPTE for B & M is a violation of the status quo provisions of sections 2, 3, 5, and 6 of the RLA and seek an injunction restoring the pre-Standard Agreement status quo as to these workers (Counts I and VII). Second, Plaintiffs seek a declaration that the proposal and the handling to date of these section 6 notices violate the Railroads' duty under section 2 First to exert every reasonable effort to make and maintain agreements (Count I). Finally, Plaintiffs seek a declaration that the following provisions of the Standard Agreement are unlawful under section 2, 3, and 5 of the RLA: those that attempt to interfere

---

5. The Railroads had filed suit against the Board seeking to compel the appointment of a mediator and the commencement of mediation on their notices. The United States District Court for the District of Columbia found that it could not require the NMB to commence mediation while the present action was pending and dismissed the case. *Boston & Maine Corp. v. National Mediation Board*, No. 86–2902, Mem. Order (D.D.C. Jan. 29, 1987).

with established craft lines (Count II); those that prohibit the adjustment of minor disputes or the mediation of major disputes (Count III); those that would permit the Railroads to discipline workers for exercising their organizational rights (Count IV); those that are in conflict with the moratorium provisions of various agreements (Count V); and those that are in conflict with the protections imposed by the Interstate Commerce Commission (ICC) (Count VI). Plaintiffs also seek an injunction mandating the withdrawal of those portions of the Standard Agreement detailed in Counts II, III, and IV and prohibiting any further attempt to implement these latter provisions. The Railroads have also filed a Counterclaim in which they assert that Plaintiffs have failed to bargain in good faith.

## III. THE IMPOSITION OF THE STANDARD AGREEMENT ON ARASA AND IFPTE MEMBERS

The Court finds that there is no genuine issue of material fact regarding the propriety of the unilateral actions by D & H and B & M in imposing the Standard Agreement on those workers represented by ARASA and IFPTE. In both instances, the issue as to which the parties disagree is the timeliness of each union's request for the services of the NMB. A timely request

under section 6 of the RLA is one made within ten days after termination of conferences; such a request would preclude either Railroad from unilaterally imposing the Standard Agreement until the further procedures under the RLA are exhausted. 45 U.S.C. § 156.[6] An untimely request would allow either to resort to self-help. *Id.* The Court concludes that each union made a timely request for mediation.

### A. *The Request by IFPTE*

■ There is no dispute that IFPTE made the request for mediation and the NMB received the request within the ten-day period provided by section 6. Instead, B & M argues that IFPTE's request for mediation was untimely because the NMB did not docket the request until July 23, eleven days after IFPTE received notification that B & M had terminated conferences. B & M relies on *Brotherhood of Railway, Airline & Steamship Clerks v. Philadelphia, Bethlehem & New England R.R.*, 633 F.Supp. 371 (E.D.Pa.1986) (hereafter *BRAC v. Philadelphia*); *Iberia Air Lines v. National Mediation Board*, 472 F.Supp. 104 (S.D.N.Y.1979), *aff'd mem.*, 636 F.2d 1201 (2d Cir.1980), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981), and the regulations governing requests for mediation found in title 29 of the Code of Federal Regulations, 29 C.F.R. § 1203.1,[7] for its position that the act of

---

**6.** Section 6 provides:

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or

proffer of the services of the Mediation Board.

45 U.S.C. § 156 (1982).

**7.** This regulation provides:

Applications for the mediation services of the National Mediation Board under section 5, First, of the Railway Labor Act, may be made on printed forms N.M.B. 2, copies of which may be secured from the Board's Secretary. Such applications and all correspondence connected therewith should be submitted in duplicate. The application should show the exact nature of the dispute, the number of employees involved, name of the carrier and name of the labor organization, date of agreement between the parties, if any, date and copy of notice served by the invoking party to the other and date of final conference between the parties. Application should be signed by the highest officer of the carrier who has been designated to handle disputes under the Railway Labor Act, or by the chief executive of the labor organization, whichever party files the application. These applica-

docketing the request is the act that determines timeliness.

The Court finds that none of the cited authority supports B & M's position. In *BRAC v. Philadelphia*, the court found that the union had made no request for mediation services until both after the ten-day statutory period had passed and after the union had been notified that the carrier was resorting to self-help. 633 F.Supp. at 372. The only similarity between that case and the one before this Court is that BRAC, like IFPTE, had notified the carrier within the ten-day period that it intended to seek mediation. That fact was irrelevant to the court's decision there and is equally irrelevant to the issue before this Court.

The issue in *Iberia Air Lines* is similarly distinguishable from the present case. There the union did not request the services of the NMB until two days after the statutory period had expired. 472 F.Supp. at 106. The NMB nevertheless proceeded to docket the request. The court held, however, that the act of docketing was "without significance" to the issue of whether the request was timely. *Id.* at 109. Thus, B & M may take no comfort from the holding of *Iberia*.

Finally, nothing in the cited section of the Federal Regulations suggests that docketing has any significance to the time period provided by section 6 of the RLA. The Court concludes, therefore, that IFPTE's request for mediation was made within the ten-day period provided under section 6 and the B & M's resort to self-help constitutes a violation of the status quo provision of that section. Thus, summary judgment for IFPTE on Count VII is appropriate.

### B. *The Request by ARASA*

To determine whether ARASA made a timely request for mediation, the Court must determine when the ten-day statutory period began to run. D & H argues that the time period began to run on June 2 when it received ARASA's request for an alternative conference date. Although the precise meaning of ARASA's June 2 letter is unclear, the parties agree that ARASA rejected D & H's proposal for an initial conference date and suggested that D & H select an alternative date outside of the time period mandated by the RLA.[8] Support for D & H's position rests solely on its literal reading of section 6. It argues that section 6 explicitly requires the parties to confer within the thirty-day period after notices are served. Because ARASA suggested a date well beyond the statutory time period, D & H argues that ARASA terminated the conferences by refusing to set a reasonable date. No case law on point bolsters this argument.

ARASA counters that the conferences were not terminated until it received D & H's notice on June 30. The essence of its position is that it was well within its rights to ask that D & H waive the statutory thirty-day period. It asserts that the past practices of the parties support this position. Moreover, ARASA argues that D & H had an affirmative duty under section 2 First to respond to this request. 45 U.S.C. § 152 First.[9] In ARASA's view, the RLA

---

tions, after preliminary investigation in the Board's officer [sic], are given docket number in series "A" and the cases are assigned for mediation to Board members or to mediators on the Board's staff.
29 C.F.R. § 1203.1 (1986).

**8.** D & H has offered several interpretations of this letter. Most recently, D & H states that the letter "did not expressly suggest any alternative date to confer on the D & H notice." Defendants' Supplemental Statement of Material Facts at 2. D & H has also characterized the letter as suggesting "that any conference respecting the *carrier's* notice be set for 'a date in the last quarter of this year.'" Defendants' Statement of Material Facts at 5 (emphasis added). D & H

has thus conceded that it construed ARASA's letter as proposing a conference date albeit one outside the statutory timetable.

**9.** Section 2 provides in part:
It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.
45 U.S.C. § 152 First (1982).

precludes D & H from sitting in silence until the statutory period had run and then relying on the statutory authorization to resort to self-help. Thus, the issue for the Court is whether D & H had a duty under the RLA to respond to ARASA's suggestion.

■ It has long been established that parties governed by the RLA may, by express agreement, extend, modify, or waive certain statutory requirements. *See, e.g., Airline Pilots Ass'n Int'l v. Pan American World Airways,* 765 F.2d 377 (2d Cir. 1985) (parties may agree upon the rates of pay, rules and working conditions that will constitute the status quo even though they may differ from those in effect prior to the negotiations); *Trans Int'l Airlines v. International Brotherhood of Teamsters,* 650 F.2d 949, 960–61 (9th Cir.1980) (parties can agree to forfeit their right to exercise self-help after procedures under the RLA are exhausted); *Childers v. Brotherhood of R.R. Trainmen,* 192 F.2d 956, 959 (8th Cir.1951) (parties may waive actual notice under section 6 by accepting constructive notice and by participating in the ensuing conferences); *Flight Eng'r Int'l Ass'n v. Eastern Air Lines,* 208 F.Supp. 182, 191 (S.D.N.Y.1962) (same). Waiver may not be established, however, from past practice alone. *International Longshoremen's Ass'n v. Toledo Lakefront Dock & Pellet Co.,* 776 F.2d 1341, 1344 (6th Cir.1985). This power of the parties to modify the statutory requirements is implicit in the structure of the RLA and entirely consistent with its purposes.

As the Supreme Court has noted, the purpose of the RLA is "to encourage collective bargaining." *Detroit & Toledo Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969). Among the mechanisms central to this purpose is "the power given to the parties and to representatives of the public to make the exhaustion of the Act's remedies an almost interminable process." *Id.* at 149, 90 S.Ct. at 299. Thus, the require-

ments of section 6 are best read as mechanisms which ensure that the parties to the dispute begin to communicate with each other. They are not inflexible deadlines incapable of modification, by express agreement, where the circumstances of the parties to the dispute mandate a different timetable.

■ It is clear to the Court that ARASA might properly request a meeting date outside of the statutory thirty-day period. Moreover, although the RLA does not go so far as to require D & H to accept this counter proposal, the RLA does place upon D & H a duty to communicate its rejection to ARASA. To hold otherwise would penalize a party from seeking a permissible waiver of the statutory requirements and thus would discourage parties from requesting concessions that may in some cases be necessary to effective negotiations at this initial stage of the statutory procedures. Such a result would be contrary to the very purpose of the RLA.

The Court holds that D & H's sandbagging tactics are in direct conflict with its duty under section 2 First of the RLA "to exert every reasonable effort ... to settle all disputes" arising under the statute. 45 U.S.C. § 152 First. Consequently, the Court finds that D & H terminated conferences on June 30 and that ARASA's invocation of the services of the NMB on July 9 was timely. Thus, D & H's resort to self-help constitutes a violation of the status quo provisions of section 6. Partial summary judgment for Plaintiff RLEA on Count I is appropriate.

## IV. CHARGES OF BAD FAITH

Each side to this dispute has alleged that the other side has failed to "exert every reasonable effort" to settle the dispute raised by the Railroads' section 6 notices, a claim which the Court, for the sake of brevity, characterizes as bad faith bargaining.[10] Plaintiffs' claim of bad faith rests

---

**10.** The Court does not imply by its use of this shorthand that it has taken any position with regard to the standard necessary to show a violation of section 2 First or on its perception

of the relationship of that standard to the good faith standard found in the National Labor Relations Act (NLRA). *Compare Japan Air Lines v. International Ass'n of Machinists,* 389 F.Supp.

on two grounds: one, the substance of the Railroads' proposals; and two, the manner in which the Railroads had conducted the initial conferences. The Railroads' counterclaim of bad faith rests on the lack of meaningful participation on the part of the unions at these same conferences. Moreover, they claim that because Plaintiffs have bargained in bad faith, section 8 of the Norris-LaGuardia Act, 29 U.S.C. § 108, bars Plaintiffs' claim for injunctive relief in this case.

With respect to the present motions, Plaintiffs argue that all allegations of bad faith raise genuine issues of material fact rendering summary judgment inappropriate. The Railroads, however, sharply bifurcate their argument. Although they do not argue that their actions constitute good faith as a matter of law, they do argue that Plaintiffs' claim is nonjusticiable while the dispute is pending before the NMB. Alternatively, they argue that Plaintiffs' claim is not ripe. Nevertheless, in the next breath, they press their own counterclaim of bad faith bargaining on the basis that there is no genuine issue of material fact regarding Plaintiffs' intent not to bargain. The Court addresses each argument in turn, beginning with the Railroads' challenge to the Court's jurisdiction.[11]

### A. *Nonjusticiability*

The Railroads rely primarily on two general policies to support their argument: the policy restricting judicial review of the processes of mediation, *see International Ass'n of Machinists v. National Mediation Bd.,* 425 F.2d 527 (D.C.Cir.1970), and the policy against judicial interference with the collective bargaining processes of the RLA, *see General Comm. of Adjustment v. Missouri-Kansas-Texas R.R.,* 320 U.S.

27, 34 (S.D.N.Y.1975), *aff'd in part, vacated as moot in part,* 538 F.2d 46 (2d Cir.1976) (district court assumed that RLA imposed a higher standard of negotiation efforts than the NLRA standard of good faith) *with REA Express, Inc. v. Brotherhood of Ry., Airline & Steamship Clerks,* 358 F.Supp. 760, 771–72 & n. 43 (S.D.N.Y.1973) (district court assumed similar higher duty but cited cases demonstrating the lack of unanimity among the courts on this issue).

323, 332–37, 64 S.Ct. 146, 150–53, 88 L.Ed. 76 (1943) (hereafter *M–K–T*). Plaintiffs counter that the policy articulated by the Supreme Court in *M–K–T* does not apply here because the Court has expressly authorized judicial enforcement of the duty to bargain in good faith mandated by section 2 First. *See Chicago & N.W. Ry. v. United Transp. Union,* 402 U.S. 570, 577, 581, 91 S.Ct. 1731, 1735, 1737, 29 L.Ed.2d 187 (1971). Moreover, Plaintiffs argue that this Court provides the only forum in which their rights may be vindicated since the NMB lacks the power to adjudicate or remedy the violation alleged. *See Pan American World Airways v. International Brotherhood of Teamsters,* 275 F.Supp. 986, 995 (S.D.N.Y.1967), *aff'd per curiam on opinion below,* 404 F.2d 938 (2d Cir. 1969). Although the above-cited case law articulates the policies advocated by the parties, it does not illuminate the issue before this Court: whether the Court may appropriately, *at this point in the controversy,* enforce the duties mandated by section 2 First.

In the usual case, a charge of bad faith is brought after the parties have exhausted the procedures mandated by the RLA and one side has acted to alter the status quo. The other side may then seek to postpone the resort to self-help by filing a suit alleging bad faith in the bargaining process and seeking an injunction against the change in the status quo. *E.g., Chicago & N.W. Ry., supra.* If that party establishes its claim of bad faith, it may be entitled both to an injunction against self-help and to begin the statutory process again, beginning with conferences. *Chicago & N.W. Ry. v. United Transp. Union,* 471 F.2d 366, 369 (7th Cir.1972), *cert. denied,* 410 U.S. 917, 93 S.Ct. 965, 35 L.Ed.2d 279 (1973).

11. The Court notes that the issue of nonjusticiability may not appropriately be raised on a motion for summary judgment but rather should be raised on a motion to dismiss. 10 C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2713, at 608–13 (1983). Nevertheless, because the Court is obligated to address the issue of subject matter jurisdiction on its own initiative, the Court does not find its inquiry imperiled by the technical inadequacy of the motion before it in the context of the present case.

In some cases, the courts have stepped in to resolve disputes regarding the duty to bargain after the dispute was before the NMB; however, the issue of justiciability was not addressed. *E.g., Brotherhood of R.R. Trainmen v. Akron & B.B. R.R.*, 385 F.2d 581 (D.C.Cir.1967), *cert. denied*, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968). In fact, until just weeks ago, only one court had squarely addressed the issue of whether a district court had jurisdiction to hear a bad faith claim while the underlying dispute was pending before the NMB.

In that case, *Air Line Pilots Ass'n, Int'l v. Transamerica Airlines*, 615 F.Supp. 371 (N.D.Cal.1985), the district court found that it lacked jurisdiction to entertain a claim of bad faith prior to the exhaustion of the procedures mandated by the RLA. *Id.* at 373. On appeal, however, the Ninth Circuit reversed. 817 F.2d 510 (9th Cir.1987). That court considered some of the same arguments pressed in the present case and concluded that the policy considerations presented did not "speak to the issue of subject matter jurisdiction, which is governed by congressional enactment, and not judicial prudence." *Id.* at 514.

■ The Court agrees with the result reached by the Ninth Circuit although it places its analysis on somewhat different grounds. First, the policy concerns articulated in *International Machinists, supra*, are not highly relevant to the present case. The issue there was whether the court might properly order the NMB to terminate mediation, a decision which necessarily implicates concerns about judicial interference with the mediation process. The issue of bad faith presented here, however, is distinct from the dispute pending before the NMB. In other contexts, this distinction has favored the court's jurisdiction to decide issues as to which the NMB has no adjudicative role. *See Pan American World Airways, supra* (although NMB was considering representation dispute, court had jurisdiction to declare rights of the parties under the RLA). Second, the policy concerns advanced in *International Machinists* did not affect the court's jurisdiction; instead, they were found to affect

the scope of the court's review. 425 F.2d 538–43. Since this Court is not being asked to review any decision of the NMB, these policies are inapposite in this context. Finally, the considerations relevant to potential interference with the statutory procedures of the RLA are more properly considered under the Railroads' ripeness argument.

### B. *Ripeness*

■ The issue of ripeness, although sometimes overlapping with the issue of exhaustion, lies within the general realm of justiciability since an inquiry into ripeness focuses on the types of functions that courts should perform. Its foundation lies in the Article III requirement of a case or controversy. 4 K. Davis, *Administrative Law Treatise* § 25.1, at 350 (2d ed. 1983). The Railroads present two arguments raising this issue: the above-mentioned argument based on the policies inherent in the RLA and an argument based on the nature of the bad faith claim itself.

### *1.*

The considerations relevant to the statutory scheme of the RLA, although conflicting, favor the Court's intervention. The Railroads argue, in essence, that Congress did not contemplate allowing a party to delay mediation and thus subvert the processes of the RLA by bringing a collateral attack in the courts. Such litigation has the potential to undermine the efforts of the NMB which may, as the Railroads note, render moot the issue of bad faith. These are significant considerations, which the Court does not dismiss lightly. Nevertheless, the countervailing considerations, under the facts of this case, outweigh those advanced above.

The Court analyzes the above balance in light of both the remedy available to a party that prevails on a bad faith claim and the interference that such suits may effect in the statutory scheme of the RLA. Only a limited remedy is available to a prevailing party in these cases. Although the appropriate means by which courts may enforce the duty imposed by section 2 First are to

"be developed on a case-by-case basis," *Chicago & N.W. Ry.*, 402 U.S. at 577, 91 S.Ct. at 1735, only two remedies appear commonplace. If the dispute arises after the procedures of the RLA have been exhausted, an injunction against a resort to self-help may be "the only practical, effective means of enforcing the duty [imposed by section 2 First]." *Id.* at 583, 91 S.Ct. at 1738. In addition, the parties may be required to start the statutory process anew, *Chicago & N.W. Ry.*, 471 F.2d at 369, unless the court determines that there is not duty to bargain because the notice itself is illegal. *Brotherhood of R.R. Trainmen*, 385 F.2d at 604. In the present case, only the latter alternatives are available should either side prove bad faith: either the parties will be forced to hold meaningful conferences before invoking the services of the NMB[12] or they will be precluded from bargaining at all. This limited relief does not appear to raise the same dangers as are raised by requests for anti-strike injunctions, the relief most often addressed by the courts.

Recognizing bad faith suits at this point in the process also preserves important rights of the parties. For instance, if bad faith is established by showing that the notices are illegal, the challenger is absolved of any duty to proceed with the long, drawn-out statutory processes of the NMB. A determination of illegality, however, rests solely with the courts. A party that on its own determines it has no legal obligation to bargain takes substantial risks. First, the court may view an unwarranted refusal as bad faith. *See Brotherhood of R.R. Trainmen*, 385 F.2d at 597. Second, and most importantly, if a party makes this determination without preserving its right to invoke mediation, it creates the risk that both sides will prematurely resort to self-help, thus imperiling the stability of essential transportation services in direct contravention of a principal purpose of the RLA, "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein." 45 U.S.C. § 151a. If the Railroads' argument were correct—that the invocation of mediation destroys a court's jurisdiction over a bad faith claim—then a party seeking to vindicate its rights under the RLA would be forced to eschew a resort to mediation. In the absence of any pertinent legislative history, the Court does not believe that Congress intended to place the rights created by the RLA in conflict with the stability of the services that the RLA seeks to preserve.

The Court also does not perceive any substantial threat to the processes of the RLA. The issue of the potential illegality of notices is uniquely suited to disposition by summary judgment, *see infra* Part V, and thus should not inordinately delay subsequent negotiations. Although Plaintiffs' challenge regarding the Railroads' handling to date of these notices may delay mediation for some time, the Court finds that this delay will not unnecessarily interfere with the processes of the RLA.

First, the NMB has suspended mediation during the pendency of this suit. Thus, the parties will not need to litigate by day and mediate by night as suggested by the Railroads. Second, those courts that have discussed the procedural steps of the RLA have emphasized the importance of each step, including the initial conferences. *See Chicago & N.W. Ry.*, 402 U.S. at 594, 597, 91 S.Ct. at 1745 (Brennan, J., dissenting) (discussing purpose and effect of the RLA procedures); *Chicago & N.W. Ry.*, 471 F.2d at 369 (requiring parties to revisit each step of the statutory procedure). Under the circumstances of this case, the Court finds that the processes of the RLA would be more likely to be impaired if the parties were to proceed with mediation without having had meaningful conferences than if

---

12. At oral argument, Plaintiffs requested that any subsequent conferences be supervised by the Court including the necessity of either party obtaining court approval before conferences could be terminated. The Court believes that such an intrusion by the Court into the processes of the RLA would be unwarranted. In the event that Plaintiffs were to prevail on their claim of bad faith bargaining, the parties would be under order of this Court to resume conferences and to bargain within the meaning of section 2 First. The compulsion of the Court is a sufficient safeguard of the integrity of any ensuing conferences.

the statutory procedures were to run anew should Plaintiffs prevail.

Of particular significance to this finding are the specific allegations of bad faith presented by Plaintiffs. This case is not merely a case of alleged obduracy in bargaining.[13] Plaintiffs have alleged that the format for conferences chosen by the Railroads precluded any bargaining. It is uncontroverted that the format was unprecedented in the history of the parties' prior bargaining. *See Brotherhood of R.R. Trainmen v. Atlantic Coast Line R.R.,* 383 F.2d 225, 229 (D.C.Cir.1967), *cert. denied,* 389 U.S. 1047, 88 S.Ct. 79, 19 L.Ed.2d 839 (1968) (unions' duty to bargain on nationwide basis was colored by how parties had bargained in the past). If there is overall substance to Plaintiffs' claim, it is apparent to the Court that Plaintiffs would be entitled to participate in meaningful bargaining before the relatively more coercive forces of mediation should be applied to this dispute.

Finally, it appears to the Court that Plaintiffs' claim does not raise the "not insignificant danger that parties will structure their negotiating positions and tactics with an eye on the courts, rather than restricting their attention to the business at hand." *Chicago & N.W. Ry.,* 402 U.S. at 583, 91 S.Ct. at 1738. Consistent with their obligations under Rule 11 of the Federal Rules of Civil Procedure, counsel for Plaintiffs may not manufacture a claim of bad faith out of whole cloth in order to delay the statutory process. The Court has a variety of powers to correct such abuses. But if Plaintiffs can establish that they have been the victims of the Railroads' improper attempt to rush through the statutory procedures, recognizing Plaintiffs' claim at this point in time will not imperil these procedures. In fact, recognition of the claim is entirely consistent with the purpose of the RLA: to require an almost interminable procedure aimed at producing

agreement. Consequently, the Court finds that nothing in the RLA affects the ripeness of Plaintiffs' claim of bad faith.

### 2.

The Railroads' second argument is grounded in the standard applied in this Circuit to claims of bad faith bargaining. This standard requires the Court to evaluate the totality of the Railroads' conduct since bad faith must usually be inferred from circumstantial evidence. *See Soule Glass & Glazing Co. v. NLRB,* 652 F.2d 1055, 1103–04 (1st Cir.1981).

The purpose of this standard is to prevent the factfinder from focusing on isolated incidents of misconduct. *Id.* at 1103. It does not affect the Court's ability to adjudicate the claim at this point in time. At most, the standard merely makes Plaintiffs' case more difficult to prove since the totality of the Railroads' conduct is necessarily circumscribed by the limited time period in which it occurred. This potentiality does not mean, however, that Plaintiffs may not make the attempt.

### C. *The Merits*

The controlling determination in these bad faith bargaining claims is the subjective intent of both parties. Although the parties have supplied the Court with a voluminous documentary record, including transcripts of the conferences, the Court has no context in which to place the isolated facts established by this record. The parties must develop this context at an evidentiary trial.

## V. THE LEGALITY OF THE STANDARD AGREEMENT

Plaintiffs seek a declaration that five provisions of the Standard Agreement are illegal. The gravamen of their claim is that these provisions would vitiate certain inalienable employee rights created by the RLA. Plaintiffs contend that since these rights may not be surrendered by collective

---

**13.** In fact, allegations of obduracy, standing alone, would most likely fail to state a claim while the dispute was pending before the NMB, unless the behavior was equivalent to a total failure to bargain over mandatory subjects. Bad faith bargaining usually consists of pressing nonmandatory proposals to an impasse. *E.g., REA Express, Inc. v. Brotherhood of Ry., Airline & Steamship Clerks,* 358 F.Supp. 760, 773 n. 47 (S.D.N.Y.1973). Of course, a dispute pending before the NMB cannot be said to have reached an impasse.

bargaining, the RLA prohibits the Railroads from even proposing these provisions.

Rather than squarely addressing the issue of illegality raised by Plaintiffs, the Railroads have devoted the bulk of their argument to the case law developed under the National Labor Relations Act drawing a distinction between permissive and mandatory subjects of bargaining. They argue that this precedent precludes the Court from interfering with the collective bargaining process by reviewing what the Railroads contend are permissive opening proposals. The Court turns first to a consideration of the bases for its power to render the relief requested.

### A. Scope of the Court's Review of Section 6 Notices

The RLA expresses a "strong federal labor policy against governmental interference with the substantive terms of collective-bargaining agreements." *Chicago & N.W. Ry.*, 402 U.S. at 579 n. 11, 91 S.Ct. at 1736 n. 11. The statute itself "does not undertake governmental regulation of wages, hours, or working conditions. Instead it seeks to provide a means by which agreement may be reached with respect to them." *Terminal R.R. Ass'n v. Brotherhood of R.R. Trainmen*, 318 U.S. 1, 6, 63 S.Ct. 420, 423, 87 L.Ed. 571 (1943). In general, the courts have refused to review the reasonableness of the substantive terms of any agreement.

For instance, in *Brotherhood of Locomotive Engineers v. Baltimore & Ohio R.R.*, 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963), the Supreme Court refused to review the standards for working conditions contained in the section 6 notices challenged in that case. *Id.* at 289–90, 83 S.Ct. at 694–95. The Court held that absent a showing of bad faith or misconduct, the federal courts lacked the power to enjoin a resort to self-help once the parties had exhausted the procedures of the RLA. *Id.* at 291, 83 S.Ct. at 695.

Other courts have similarly refused to review the reasonableness of the proposals contained in challenged section 6 notices. *See, e.g., Atlantic Coast Line R.R. v. Brotherhood of R.R. Trainmen*, 262 F.Supp. 177, 185 (D.D.C.), *rev'd on other grounds*, 383 F.2d 225 (D.C.Cir.1967), *cert. denied*, 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968). Some have refused to dissect section 6 notices into legal and illegal components if the notice contains traditional economic demands. *See, e.g., REA Express*, 358 F.Supp. at 773–74.

Nevertheless, it is well-established that the federal courts provide the proper forum in which to challenge the legality of the terms of a collective bargaining agreement. *See, e.g., Norfolk & Western Ry. v. Nemitz*, 404 U.S. 37, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971); *Felter v. Southern Pacific Co.*, 359 U.S. 326, 79 S.Ct. 847, 3 L.Ed.2d 854 (1959); *Taylor v. Missouri Pacific R.R.*, 794 F.2d 1082 (5th Cir.) *cert. denied*, — U.S. ——, 107 S.Ct. 670, 93 L.Ed.2d 721 (1986); *McElroy v. Terminal R.R. Ass'n*, 392 F.2d 966 (7th Cir.1968), *cert. denied*, 393 U.S. 1015, 89 S.Ct. 610, 21 L.Ed.2d 559 (1969); *Roberts v. Lehigh & N.E. Ry.*, 323 F.2d 219 (3d Cir.1963). Moreover, the federal courts have also reviewed the legality of section 6 notices where the terms of the notices have been imposed upon a party through a resort to self-help.

Returning to the *Baltimore & Ohio R.R.* case, the Court focuses on the facts as detailed in the opinion of the Seventh Circuit, from which the Supreme Court granted *certiorari*. That opinion reveals that the legality of the challenged rules was raised by the unions for the first time on appeal. They argued that the notice was "susceptible of the interpretation that it announces the repudiation of 'craft' or 'class' in certain situations, a concept at the very heart of the Railway Labor Act." *Brotherhood of Locomotive Eng'r v. Baltimore & O.R.R.*, 310 F.2d 503, 512 (7th Cir.1962). The Circuit articulated two grounds for rejecting this argument. The first was the unions' procedural default. *Id.* Nevertheless, the Circuit considered the merits of the unions' argument and found that the challenged rules merely encompassed the assignment of work and not any subject protected by the RLA. *Id.* at 512–13. The Supreme Court opinion af-

firmed this conclusion, 372 U.S. at 289, 83 S.Ct. at 694, and thus its opinion should not be read as prohibiting under all circumstances any inquiry into the legality of a section 6 notice.

The results in *REA Express* and *Atlantic Coast Line* are consistent with this analysis. In *REA Express*, there was no threat that the union's allegedly illegal demands were to be imposed on the carrier. Instead, the carrier was seeking to enjoin the union's resort to self-help by attempting to establish that the union had bargained in bad faith. 358 F.Supp. at 770–71. The court refused to consider the illegality of some of the union's proposals since these proposals were not pressed to an impasse, the traditional test of bad faith bargaining. *Id.* at 773 n. 47. *Atlantic Coast Line* was also an action to enjoin a strike. There is no suggestion in that case, however, that the proposed terms of the section 6 notices were illegal. At most, the challenge was to their reasonableness. 262 F.Supp. at 185.

There are two other limited circumstances in which the federal courts have reviewed the legality of the terms proposed in section 6 notices prior to their imposition through either agreement or self-help: where the service of the notice is clearly prohibited by a previously imposed moratorium and where the entire subject matter of the notice is illegal on its face. *See, e.g., Brotherhood of R.R. Trainmen,* 385 F.2d at 599 (finding that moratorium in question did not prohibit the service of section 6 notices); *id.* at 603–04 (finding that notice which sought to abrogate the vested rights of the parties was illegal). Other than these limited circumstances, there appears to be no instance in which a court, or even the National Labor Relations Board, has required that a proposal be withdrawn merely because of its illegality.

■ The Court finds, therefore, that the cited precedent establishes the appropriate scope of its inquiry in the present case. In light of the policy considerations articulated above, the Court, in the exercise of its discretion under 28 U.S.C. § 2201, declines to address Plaintiffs' request for declaratory relief on grounds outside those established by this precedent. Thus, under the circumstances of this case, the Court may consider whether the service of the challenged section 6 notices is illegal, either because their service was prohibited by previous agreements (Count V) or because the entire subject matter of the notices is illegal (Count I). Since the terms of the Standard Agreement will not have been imposed on any of the Railroads' employees after the issuance of this opinion, the Court lacks the ability to dissect the proposal into legal and illegal components as Plaintiffs have requested in Counts II, III, IV, and VI. Thus, these counts should be dismissed. As the Court reads Plaintiffs' Complaint, however, similar relief could be available under Count I if the Standard Agreement were imposed on these employees at some later time during the pendency of this controversy.

### B. *The Merits*

■ Plaintiffs have advanced two contentions within the above-established parameters. First, Plaintiffs allege that the illegalities contained within the Standard Agreement, particularly the proposed "Railroader" classification, taint the Agreement in its entirety. Plaintiffs argue that this new classification was intended by the Railroads to be the central feature of the Standard Agreement. Consequently, Plaintiffs press for a hearing on the Railroads' intent in serving the challenged notices and their purpose in proposing the "Railroader" classification. The Court finds, however, that the inquiry suggested by Plaintiffs is precisely the type of inquiry that lies outside the proper scope of the Court's power. The Court notes that the Agreement contains many provisions lying within the mandatory subjects of bargaining relating to "rates of pay, rules, or working conditions." 45 U.S.C. § 156. Moreover, none of the alleged illegal provisions expressly constitutes the essence of the overall proposal. The Court's inquiry must end here. Absent the imposition of the Standard Agreement on the Railroads' employees, the Court's powers to enforce the duties of the RLA do not authorize the Court to

dissect proposals into legal and illegal components by probing either party's motivations. Unless illegal on their face and in their entirety, opening proposals that contain bargainable subject matter are not subject to further review. Consequently, the Court cannot find that the Standard Agreement is illegal in its entirety.

The Plaintiffs' second contention is that all the Railroads are precluded from serving the Standard Agreement on BRAC and that MEC/PT is precluded from serving the Standard Agreement on BMWE [14] because the collective bargaining agreements between these parties contain moratorium provisions. The Railroads counter that the BRAC moratorium does not preclude the service of the present notice as the moratorium applies to only the issue of job protection. The Court may address this issue only if the Railroads' position is not arguably supported by the contract language. *Brotherhood of Locomotive Eng'r v. Boston & Maine Corp.*, 788 F.2d 794, 798 (1st Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986). Otherwise, the issue constitutes a minor dispute within the exclusive jurisdiction of the National Railroad Adjustment Board. *Id.*

■ With respect to the BRAC moratorium, the Court's review of the Stabilization Agreement, within which the moratorium provision appears, reveals that every article of this agreement expressly refers to protected employees. Thus, the Court finds that the Railroads' position is arguably supported by the contract language. Consequently, the merits of Count V as to BRAC constitute a minor dispute over which this Court has no jurisdiction. With respect to the BMWE moratorium, the Court finds that both parties have failed to establish any factual record thus precluding the Court from rendering summary judgment at this time.

## VI.  ORDER

For the reasons detailed in full above, the Court hereby:

(1) GRANTS Plaintiffs' Cross-Motions for Partial Summary Judgment with respect to that portion of Count I that alleges that Defendant D & H imposed the Standard Agreement on its employees represented by ARASA prior to the exhaustion of the dispute resolution process of the RLA and with respect to Count VII which alleges a similar violation by B & M with respect to those employees represented by IFPTE;

(2) ORDERS D & H and B & M to reinstate the status quo as it existed with respect to ARASA and IFPTE prior to July 1 and July 30, 1986, respectively;

(3) DENIES Plaintiffs' Cross Motion for Summary Judgment and GRANTS Defendants' Motion for Summary Judgment with respect to that portion of Count I that alleges that the proposal and/or service of the Standard Agreement is illegal;

(4) DISMISSES Counts II, III, IV, and VI of Plaintiffs' Complaint;

(5) DEFERS for later adjudication that portion of Count V of Plaintiffs' Complaint that alleges violations of the BMWE moratorium pending supplemental briefing by the parties;

(6) DISMISSES in part that portion of Count V of Plaintiffs' Complaint that alleges violations of the BRAC moratorium for lack of subject matter jurisdiction; and

(7) DENIES all motions as to the remainder of Count I of Plaintiffs' Complaint and Defendants' Counterclaim and places this part of the case on the Court's trial list.

So ORDERED.

---

**14.** The moratorium issue with regard to BMWE has been raised only in Plaintiffs' Supplemental Statement of Undisputed Material Facts in Support of Cross-Motion for Summary Judgment, filed March 24, 1987. The parties have not briefed this issue, nor does the statement provided by Plaintiffs establish a set of undisputed facts that would entitle either party to relief.