UNITED AIR LINES, INC., Plaintiff,

v.

LOCAL 851, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al., Defendants.

No. CV–88–2537.

United States District Court, E.D. New York.

Sept. 30, 1988.

Richard Schoolman, Eikenberry, Futterman & Herbert, New York City, for plaintiff.

Stephen Kahn, New York City, for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

In this case of first impression involving the Railway Labor Act, 45 U.S.C. §§ 151–188 ("the RLA"), plaintiff United Airlines ("United") asks the Court to preliminarily enjoin a secondary picket against its cargo loading facilities by defendant Airline Division of the International Brotherhood of Teamsters ("the Teamsters"). The Teamsters' dispute is with, and its primary strike is against, Virgin Atlantic Airways, Ltd. ("Virgin"), which is not a party to this action.

The unique facts of this case require the court to answer the following principal questions:

(1) Where the National Mediation Board conducts a union representation election in which it counts the votes of *nonemployees,* even though the Board knows that a federal court has dismissed the reinstatement actions of those non-employees, and the votes of those *non-employees* determine the outcome in favor of a union, but the employer thereafter absolutely refuses either to recognize the Board's certification or to deal with the union—must the union bring an action in federal court to enforce the certification before engaging in a primary strike and secondary picketing?

(2) If the union is obligated to bring such an action under those circumstances, but instead engages in a primary strike and secondary picketing, can the target of the secondary picketing obtain an injunction?

For the reasons stated below, this court will answer both questions in the affirmative.

## I. DISCUSSION

In order to prevail on a motion for preliminary injunction in a case such as this, plaintiff must establish (a) irreparable harm to itself, or to the public interest in the uninterrupted flow of commerce, *see Virginian Railway Co. v. System Federation,* 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937), and (b) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979); *Local 553, Transport Workers Union of America, AFL–CIO v. Eastern Air Lines, Inc.,* 695 F.2d 668, 675 n. 5 (2d Cir.1982).

### A. *Likelihood of Success on the Merits/Presence of Serious Question*

#### 1. Facts.

The following facts are undisputed.

During the course of a campaign to organize the fleet service workers of Virgin Atlantic Airways, the Teamsters and six former Virgin Atlantic fleet service employees commenced an action in federal district court alleging that the six employees had been discharged in violation of the RLA because of their support for the organizing drive. The suit also alleged that Virgin had unlawfully interfered with, influenced and coerced its employees during the Teamsters' organizing campaign. (Ex. 6 at p. 7). Before trial, two of the six individual plaintiffs were rehired. (*Id.* at pp. 8, 12). The trial was held on April 25 and 26, 1988, coinciding with the scheduled counting of union certification election ballots on April 25, in an election conducted by the NMB pursuant to RLA § 152 Ninth to determine whether the Teamsters would represent Virgin's fleet service workers in collective bargaining.

Under the NMB's rules for counting ballots in union certification elections, dismissed individuals are only eligible to vote so long as they have an action pending

before a court of competent jurisdiction for reinstatement due to wrongful dismissal. NMB Rules and Regulations § 1206.6, 29 C.F.R. § 1206.6, and NMB Representation Manual § 5.304 (Ex. 3). Since, as a result of another NMB ballot-counting rule, the votes of the four dismissed employees could determine the outcome of the election, Virgin asked the NMB to delay counting the ballots for one day, and to impound the ballots of the four plaintiffs who had not been reinstated. (Ex. 2). Although the NMB denied Virgin's requests, the ballot count was postponed for unrelated reasons from April 25 to April 27 at 2:00 p.m. (Exs. 4, 5).

At 11:20 a.m. on April 27, the federal district court announced its ruling that the individual plaintiffs were not wrongfully discharged.[1] *Hodges v. Virgin Atlantic,* No. 88 Civ. 1370 (LLS) (S.D.N.Y., June 10, 1988) [available on WESTLAW, 1988 WL 36488]. (Ex. E). Inexplicably, on that same day, having been apprised of the court's decision by Virgin's counsel before the ballots were counted, the NMB nevertheless included the ballots of the four plaintiffs in the certification election count. (Transcript of August 23, 1988 Hearing ["TR"] 14, Ex. 7). Those four votes swung the election. On the basis of this disputed tally, the NMB certified the Teamsters as the representative of Virgin's fleet service employees. *Virgin Atlantic Airways,* 15

NMB No. 55 (1988). (Ex. A). The NMB denied Virgin's request for reconsideration on May 20, 1988. (TR 18).

Believing that the NMB certification lacked any legal basis, Virgin refused to recognize it or the Teamsters, and refused absolutely to negotiate.[2] (TR 17). Its position continues to be that there is "no union" at Virgin Atlantic Airways (TR 16, 86–87), and it has acted in accordance with that position, not only in refusing to bargain but in unilaterally changing pay rates, shift hours and work rules.[3]

Unable to bring Virgin to the bargaining table, the Teamsters began a strike against Virgin on July 6, picketing at Virgin's Newark and Kennedy International Airport terminals. (TR 61).

The Teamsters subsequently applied to the NMB to furnish mediation services pursuant to 45 U.S.C. § 152 Ninth, and a mediation session was held on August 8, 1988,[4] at which Virgin again refused to negotiate. (TR 15–16, 63). On or about that same day, the Teamsters notified United that it was contemplating expanding its activities to include secondary picketing at United's Kennedy and Newark job sites. (TR 64–65). The following day, Virgin fired the striking workers (Ex. C), and less than a week later, the Teamsters expanded the picketing to United's job sites.[5] On August 23, 1988, this court granted a temporary

---

1. The court also ruled that Virgin had violated the RLA by telling employees that Virgin could farm out work if faced by "outrageous demands from a Union." (Exs. 6, E). The court ordered that Virgin post notices specifically withdrawing that representation and stating the the company had been prohibited from further harassing any organizing effort.

2. Although it would appear, based on the record, that Virgin's view of the certification's legal validity has merit, *see* n. 12, *infra,* this court has not been asked to determine that issue, nor can it, since it is United and not Virgin which seeks relief in this action. The certification issue is part of the primary dispute between the Teamsters and Virgin, a dispute which is not before this court.

3. The Teamsters claim these changes constitute further violations of the RLA's provisions, specifically those requiring maintenance of the "status quo" pending statutory mediation. 45 U.S.C. § 156. Virgin claims that there is no

union to negotiate with or with which to engage in statutory mediation attempts, and that consequently, the status quo provisions of the RLA have not been triggered. Since any dispute over the violation *vel non* of the status quo provisions is entirely derivative of the fundamental dispute over the validity of the NMB certification, the Teamsters' claims regarding status quo violations will not be discussed further.

4. An earlier application, dated June 13, 1988, was rejected on technical grounds. (Ex. "I").

5. The Teamsters also expanded the picketing to the job site of Compagnie Nationale Air France at Kennedy International Airport. This Court permanently enjoined that picketing on August 23, 1988, on the ground that no evidence supported the Teamster's allegation that Virgin was doing business with Air France as of that date. (TR 122–29).

restraining order enjoining this secondary picketing by the Teamsters against United.

## 2. Statutory Framework.

■ If the Teamsters have no right under the RLA to engage in a primary strike against Virgin, they have no right to engage in a secondary picket against United.[6] Thus, the likelihood of plaintiff succeeding on the merits in this action turns on application of the RLA to the dispute between the Teamsters and Virgin.[7] Background regarding the RLA therefore is a prerequisite to discussing the parties' conflicting theories of this case.

The "primary goal of the RLA is to settle strikes and avoid interruptions to commerce[.]" *Burlington Northern Railroad Company v. Brotherhood of Maintenance of Waye Employes*, 481 U.S. 429, 107 S.Ct. 1841, 1854, 95 L.Ed.2d 381 (1987). "In adopting the Railway Labor Act, Congress endeavored to bring about stable relationships between labor and management in this most important national industry." *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.*, 353 U.S. 30, 40, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957).

The Act establishes different dispute-resolution mechanisms for different types of disagreements. *See Air Line Pilots Association v. Texas International Airlines, Inc.*, 656 F.2d 16, 20 n. 6 (2d Cir.1981). "Representation disputes," which involve controversies surrounding the designation and authorization of representatives of employees covered by the RLA, are committed to the exclusive jurisdiction of the NMB. 45 U.S.C. § 152 Ninth. *See Switchmen's Union of North America v. National Med-*iation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943). The NMB must, upon the request of either party, investigate the representation dispute and certify within 30 days the representative of the craft or class of employees in question. This certification procedure is "the sole and mandatory means for resolving disputes over representation." *Summit Airlines, Inc. v. Teamsters Local Union No. 295*, 628 F.2d 787 (2d Cir.1980); *AMR Services Corp. v. International Brotherhood of Teamsters*, 658 F.Supp. 259, 262 (E.D.N.Y.), *aff'd per curiam*, 821 F.2d 162 (2d Cir.1987). Once the certification is granted, the carrier is obliged by 45 U.S.C. § 152 Ninth to "treat with" the certified employee representative. The Supreme Court long ago held that this obligation is mandatory and that a union may enforce it by obtaining an injunction. *Virginian Railway Co. v. System Federation*, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937). As discussed below, the availability of this simple judicial remedy lies at the heart of the controversy in this case.

"Major disputes" involve attempts to change rates of pay, rules, or working conditions, 45 U.S.C. § 155 First (a). Another formulation, employed by the Supreme Court, defines a major dispute as one concerning the "formation of collective agreements or efforts to secure them." *Burlington Northern*, 107 S.Ct. at 1844 quoting *Elgin, Joliet & Eastern Railway Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945)).[8] In such cases, the NMB is to use its best efforts to bring the parties to an agreement or, if these mediation efforts fail, to induce them to

---

**6.** This is implicit in the Second Circuit's holding that a union which *had* acquired the right to engage in a primary strike through exhaustion of RLA procedures thereby also acquired the right to engage in secondary picketing *without* exhausting those procedures. *Consolidated Rail Corp. v. Brotherhood of Maintenance of Way Employees*, 792 F.2d 303 (2d Cir.1986). The right of the union to engage in secondary picketing thus derived from its right to engage in a primary strike.

**7.** Congress made the Railway Labor Act applicable to airlines in a 1934 amendment to the Act, 49 Stat. 1189, 45 U.S.C. §§ 181–188, and the

parties do not dispute that the Act is applicable here.

**8.** "The terms 'major dispute' and 'minor dispute' do not exist in the RLA. They were first used in *Elgin* to describe, respectively, disputes that must go through the drawn out procedures of conference and mediation and for which there are status quo requirements, and disputes that go to an arbitration board under section 3 of the Act (or under section 204 for air carriers)." *Air Cargo, Inc. v. Local Union 851, International Brotherhood of Teamsters*, 733 F.2d 241, 245 n. 3 (2d Cir.1984).

submit to arbitration. If this also fails, no change shall be made in rates of pay, rules, or working conditions or established practices for 30 days and, if within that period an emergency board is created, for 30 days after its report. 45 U.S.C. § 155, 156, 160. After this process is exhausted, the parties may resort to self-help, including strikes. *Seaboard World Airlines, Inc. v. Transport Workers Union*, 425 F.2d 1086, 1089–1090 (2d Cir.1970) (Friendly, J.) (citing *Brotherhood of Locomotive Engineers v. Baltimore & Ohio Railroad Co.*, 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963) *and Brotherhood of Railway & Steamship Clerks v. Florida East Coast Railway*, 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966)).

"Minor disputes," which involve grievances over the "meaning or proper application of a particular provision" in an existing collective bargaining agreement are to be resolved through binding arbitration before an adjustment board whose awards are "final and binding" upon the parties and enforceable in the district courts. 45 U.S.C. § 153 First (m), (p). Since no collective bargaining agreement exists between the Teamsters and Virgin, neither of the parties to this action claim that these facts present a "minor dispute."

Over and above its specific procedural requirements for resolving "representation," "major," and "minor" disputes, the Act also imposes a generalized duty on employers and employees to "exert every reasonable effort to ... settle all disputes ... in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152 First. This duty, the Supreme Court has written, lies at "[t]he heart of the Railway Labor Act," *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377–378, 89 S.Ct. 1109, 1114–15, 22 L.Ed.2d 344 (1969), and constitutes a legal obligation which a federal court can enforce by issuing an injunction. *Chicago & North Western Railroad v. United Transportation Union*, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971). *But see Burlington Northern*, 107 S.Ct. 1841, 1854–55 & n. 15 (1987) (discussed *infra*).

The parties differ sharply in their assessment of how the RLA's provisions apply to the Virgin–Teamsters election certification dispute.

United proffers three principal arguments:

(1) That the Teamsters could easily resolve their dispute with Virgin over the NMB certification by bringing suit to enforce the certification under the rule in *Virginian Railway*, and that their failure to do so is an enjoinable violation of § 152 First of the RLA, which, as observed above, requires the Teamsters (as well as Virgin) to "exert every reasonable effort" to resolve disputes and avert any interruption to commerce.

(2) That the certification dispute should be regarded as a "major" dispute in view of the fact that the Teamsters have initiated the mediation procedures provided for such disputes under the RLA, 45 U.S.C. § 155 First. Accordingly, goes the argument, the strike is illegal and enjoinable until the Teamsters exhaust all the RLA "major dispute" procedures.

(3) That the dispute, if seen as a "representation dispute," should be enjoined due to the availability of a non-mandatory judicial remedy, *i.e.*, judicial enforcement of the certification.

The Teamsters counter with the following arguments:

(1) That the Norris–LaGuardia Act, 29 U.S.C. §§ 101–15, prohibits the court from enjoining the strike, except where necessary to prevent the clear violation of an express RLA provision. The Teamsters argue that this exception is inapplicable here because the dispute with Virgin over the NMB certification is *neither* a "representation" nor a "major" dispute, and because nothing in the RLA expressly *requires* a union to seek judicial enforcement of an NMB certification (although this is *permitted* by the *Virginian Railway* case). Therefore, the strike does not violate an express RLA provision and injunctive relief is barred by the Norris–LaGuardia Act.

The subsidiary arguments pressed by the Teamsters are (a) that the dispute is not a "representation" dispute because the Teamsters already exhausted the RLA's certification procedure for establishing representation, 45 U.S.C. § 152 Ninth, and the RLA imposes no express additional requirement that the certification be judicially enforced; and (b) that to characterize the dispute as a "major" dispute would unfairly burden the Teamsters with maintaining the status quo, while leaving Virgin free to pursue what the Teamsters regard as continuing violations of that status quo.

For reasons discussed below, the court adopts United's view of the Teamsters' obligations under § 152 First of the RLA, holding that the primary strike *could* be enjoined, and that the secondary picketing *will* be enjoined, despite the fact that (as the Teamsters insist) the certification dispute cannot accurately be characterized either as a "representation" or a "major" dispute.

### 3. This Case Does Not Involve a "Major Dispute"

█ United asserts that, since the Teamsters have already filed an application to the Mediation Board, they must exhaust the "almost interminable process" of negotiation, mediation, voluntary arbitration and conciliation required by the RLA. *Detroit & Toledo Shore Line Railroad v. United Transportation Union*, 396 U.S. 142, 149, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969). United's attempt to characterize this dispute as a "major" dispute currently undergoing statutory mediation is without merit. The cases relied on by United demonstrate that this is not a "major" dispute. None of them involved a carrier's refusal even to recognize the existence of a union certified by the NMB as the authorized representative of the carrier's employees. In *International Association of Machinists and Aerospace Workers, AFL–CIO v. National Mediation Board*, 425 F.2d 527 (D.C.Cir.1970), the parties were already in a bargaining posture prior to any request

for NMB mediation, as evidenced by the exchange of 162 separate notices of proposed changes in the collective bargaining agreement. *Id.*, 425 F.2d at 530. Similarly, the opinion in *Seaboard Airways v. Local 851, International Brotherhood of Teamsters*, 501 F.Supp. 47 (E.D.N.Y.1980) indicates that the parties engaged in over a month of mediation before the union brought suit to have an impasse declared (which relief the court denied). This is not, as United would have it, a suit impermissibly seeking "a court-ordered *end* to mediation," United's Post–Hearing Brief at 10, quoting Briton, *Collective Bargaining Under the Railway Labor Act: The Management Perspective*, in [ALI–ABA] Airline Labor Law Materials 183 (April 1987) (emphasis added). Here, mediation has not meaningfully *begun*, and cannot begin, given Virgin's stand that no union representative exists.

Even if this were a "major dispute," the court would be compelled to reject United's related argument that the Teamsters cannot strike until the parties are "released" from mediation by the NMB. United ignores the obvious facts that the NMB is not authorized by the relevant statute, 45 U.S.C. § 155 First, to resolve this dispute, and has not been asked to do so by the parties. The statute, as noted above, only authorizes the Board to furnish mediation with respect to "[a] dispute concerning changes in rates of pay, rules, or working conditions ...", and the Teamsters' request for mediation was precisely limited to these issues. (Ex. 1). Section 155 First does not give the Board the authority to adjudicate *any* issue of law,[9] and it would be particularly inappropriate, as part of the mediation process, for the Board to attempt to determine whether the Board itself acted in "gross violation" of the RLA by counting non-employees' votes in the certification election. *British Airways Board v. National Mediation Board*, 685 F.2d 52, 55 (2d Cir.1982) (federal courts have jurisdic-

9. Under § 152 Ninth, the Board does possess "an adjudicatory function in the settlement of representation disputes," *General Committee v. Missouri–Kansas–Texas Railroad Co.*, 320 U.S. 323, 330, 64 S.Ct. 146, 149, 88 L.Ed. 76 (1943), but the Board, for better or worse, has already discharged that responsibility by certifying the Teamsters in this case.

tion to review NMB certification in instances of constitutional dimension or involving gross statutory violation); *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 158–59, 90 S.Ct. 294, 303–04, 24 L.Ed.2d 325 (1969) ("[T]he Mediation Board has no adjudicatory authority with regard to major disputes, nor has it a mandate to issue regulations construing the Act generally."). Thus, the fact that the Teamsters have requested mediation services under the RLA could not, in itself, prevent a court from considering Virgin's application for a preliminary injunction, if it chose to make one. *See Pan American World Airways, Inc. v. International Brotherhood of Teamsters*, 275 F.Supp. 986, 995 (S.D.N.Y. 1967), *aff'd per curiam on opinion below*, 404 F.2d 938 (2d Cir.1969) (court not barred from adjudicating legal issue under the RLA while NMB was still furnishing mediation, because NMB was not authorized under § 155 First to make a binding legal determination of that issue); *Air Line Pilots Association, International v. Transamerica Airlines, Inc.*, 817 F.2d 510, 513 (9th Cir.1987) (court has jurisdiction to enforce "reasonable efforts" provision of 45 U.S.C. § 152 First even while mediation is in progress); *Iberia Airlines v. National Mediation Board*, 472 F.Supp. 104, 108–09 (S.D.N.Y.1979), *aff'd*, 636 F.2d 1201 (2d Cir. 1980), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981) (NMB had no adjudicatory authority to construe 45 U.S. C. § 156 so as to permit itself to grant request for mediation filed more than ten days after failure of parties to reach agreement in conference); *Railway Labor Executives' Association v. Boston & Maine Corp.*, 664 F.Supp. 605, 613 (D. Maine 1987) (court has jurisdiction to decide issues as to which the NMB has "no adjudicative role").

While the court accepts the Teamsters' contention that this case does not involve a "major" dispute, it rejects the Teamsters' proffered rationale. The Teamsters assert that "[n]o proper interest is served by shackling the Union with the status quo obligations of a major dispute" while Virgin continues, in the union's view, to violate the RLA by refusing to negotiate and to illegally alter the status quo by announcing changes in pay, hours and work rules. However, it is often the case that the RLA imposes unequal burdens on the parties to a "major dispute," because of its fundamental emphasis on preventing interruptions to commerce. The union's remedy, if this were a "major" dispute, would be to seek judicial enforcement of the status quo, pursuant to 45 U.S.C. § 156. The major dispute resolution mechanism, in short, does not "strip[ ] labor of its primary weapon [of striking] without substituting any reasonable alternative." *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.*, 353 U.S. 30, 41, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957) (injunction may issue to prevent strike over "minor dispute" before an RLA arbitration board).

4. The Teamsters' Strike Is Illegal Because It Violates the Statutory Duty to "Exert Every Reasonable Effort" to Settle Disputes and Avoid Interruptions to Commerce.

■ United urges the court to enjoin the secondary picketing against its facilities on the grounds that the NMB certification is readily enforceable in court, and that the Teamster's efforts to enforce it by striking contravenes the fundamental purpose of the RLA, as well as the specific command, at 45 U.S.C. § 152 First, that the parties to common carrier labor-management disputes "exert every reasonable effort" to settle those disputes without interrupting commerce.[10]

10. United cites the "closely analogous" case of *Brotherhood of Locomotive Engineers v. Louisville & Nashville Railway Co.*, 373 U.S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963) in support of its contention that the availability of a judicial remedy precludes the Teamsters from striking. However, the analogy is less than perfect, because the Court's holding that an injunction was appropriate in the L & N case turned on the availability of a judicial remedy *expressly provided for* in the RLA at 45 U.S.C. § 153 First (p). That provision permits, but does not require, the union to enforce an award granted by the Adjustment Board in a "minor dispute" by filing suit in federal court. Here, the non-mandatory judicial remedy for enforcement of an NMB

The Teamsters assert that, because the RLA does not expressly subject this dispute to any of the dispute-resolution mechanisms contained therein, the strike violates no specific provision of the RLA, and consequently, the Norris–LaGuardia Act prohibits the courts from enjoining the strike. The court agrees with part of this contention—*i.e.*, that the present dispute is neither a "major" dispute (*see* discussion, *supra* ), nor a "representation" dispute. It is not a representation dispute because that term refers only to disputes which can be resolved by the NMB acting pursuant to § 152 Ninth of the RLA. In contrast, this dispute arises out of actions the NMB has already taken pursuant to that provision.

However, the court does not agree that the Norris–LaGuardia Act would prohibit Virgin from obtaining an injunction against the strike in this case. The Norris–LaGuardia Act "expresses a basic policy against the injunction of activities of labor unions," *International Association of Machinists v. Street*, 367 U.S. 740, 772, 81 S.Ct. 1784, 1801, 6 L.Ed.2d 1141 (1961), and reflects Congress's intent to put a stop to what it viewed as the lawless use of the labor injunction by the federal judiciary. *Burlington Northern*, 107 S.Ct. at 1847–48. Section 1 of the Act, 29 U.S.C. § 101, deprives federal courts of jurisdiction to issue an injunction in any case involving or growing out of any labor dispute. Section 4, 29 U.S.C. § 104(e), lists specific acts which may not be enjoined, including publicizing a labor dispute by "advertising, speaking, [or] patrolling."

In rare instances, however, the Norris–LaGuardia act must be accomodated to the conflicting dictates of another statute. Such accomodation can only be made where the statute in question "channel[s] ... economic forces into special processes intended to compromise them," so that granting an injunction will not "strip[ ] labor of its primary weapon without substituting any reasonable alternative." *Brotherhood of*

*Railroad Trainmen*, 353 U.S. at 41, 77 S.Ct. at 640.

A line of Supreme Court cases establishes that, notwithstanding the Norris–LaGuardia Act's prohibitions, injunctions may issue to prevent the violation of a specific mandate of the RLA. *Burlington Northern*, 107 S.Ct. at 1851; *Chicago & North Western Railway*, 402 U.S. at 581–84, 91 S.Ct. at 1737–39 (failure to maintain *status quo* pending exhaustion of mandatory mediation procedures in a "major dispute"); *Detroit & Toledo Shore Line Railroad v. United Transportation Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (same); *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.*, 353 U.S. 30, 39–42, 77 S.Ct. 635, 639–41, 1 L.Ed.2d 622 (1957) (statutory duty to arbitrate "minor disputes"); *Brotherhood of Railroad Trainmen v. Howard*, 343 U.S. 768, 774, 72 S.Ct. 1022, 1025, 96 L.Ed. 1283 (1952) (nondiscriminatory representation of employees by their certified representative); *Virginian Railway Co. v. System Federation*, 300 U.S. at 559–63, 57 S.Ct. at 605–07 (compliance with provisions for certification of a bargaining representative). *See discussions in Burlington Northern*, 107 S.Ct. at 1850–51 & n. 11; *International Association of Machinists and Aerospace Workers v. Eastern Air Lines, Inc.*, 826 F.2d 1141, 1146–47 (1st Cir.1987).

The Supreme Court has held that the "reasonable efforts" language of 45 U.S.C. § 152 First is a specific mandate of the RLA, not a mere exhortation without legal effect, and that its violation can justify injunctive relief despite the ban on injunctions contained in the Norris–LaGuardia Act. *Chicago & North Western Railway, supra.* However, the Court in *Chicago & North Western* did not apply its legal holding to any facts, but remanded to the lower courts for decision in light of the holding. Consequently, the opinion offers no guidance as to when an injunction may issue to

certification is a creation of federal common law, and is not expressly provided for by the RLA (although it should be noted that the common law remedy is founded directly upon a right conferred by § 152 Ninth of the RLA, that

the carrier must "treat with" a duly certified union). *See Virginian Railway*, 300 U.S. at 546–48, 57 S.Ct. at 599. Thus, the court does not rely on United's "analogy" to L & N.

enforce the "reasonable effort" requirement of § 152 First. Moreover, the Court cautioned that "the vagueness of the obligation under [§ 152 First] could provide a cover for freewheeling judicial interference in labor relations of the sort that called forth the Norris–LaGuardia Act in the first place." *Id.*, 402 U.S. at 583, 91 S.Ct. at 1738. The Court "counsel[ed] restraint" in the use of injunctions to enforce the "reasonable effort" provision, limiting their issuance to cases "where a strike injunction is the only practical, effective means of enforcing" that provision. *Id.* at 582–83, 91 S.Ct. at 1737–38.

More recently, the Court in *Burlington Northern*, 107 S.Ct. at 1854 n. 15, injected additional uncertainty into the task of applying *Chicago & North Western* to particular facts. There the Court rejected petitioner's argument that the courts can enjoin a secondary picket commenced after the exhaustion of RLA procedures, because such a strike violates an implied duty under § 152 First. In distinguishing the case before it from others in which the Court allowed an injunction to issue to enforce an implied duty under the RLA, the Court noted that "[t]his is not ... a case in which 'the scheme of the Railway Labor Act could not begin to work without judicial involvement,'" *id.*, 107 S.Ct. at 1855, *quoting Chicago & North Western*, 402 U.S. at 595, 91 S.Ct. at 1744 (Brennan, J., dissenting),[11] and that "[i]n the instant case, by contrast, there is no 'basic command' of the RLA which the union can be said plainly to

have violated." *Id.*, 107 S.Ct. at 1854 n. 15. Additional language in a footnote appeared to limit the reach of *Chicago & North Western*'s holding:

In *Chicago & North Western*, we began by noting that the express language of [§ 152 First] creates a duty to "exert every reasonable effort" to settle disputes. The only inference we drew here was that this duty was a legal obligation enforceable by injunction under certain circumstances. The language of [§ 152 First] does not contain, however, either an express proscription of secondary activity or a suggestion that the scope of self-help is limited. Our currently narrow exception to the Norris–LaGuardia Act's prohibition on injunctions would expand to swallow the rule were we to permit the courts to enforce by injunction the obligation petitioners infer here.

*Id.*

*Burlington Northern* expresses the Court's resolve to implement the Congressional intent of the Norris–LaGuardia Act, rather than supplant it with the modern equivalent of those "self-mesmerized views of economic and social theory" which dominated the judge-made law of the late 19th and early 20th centuries. *Burlington Northern*, 107 S.Ct. at 1855 (quoting *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. at 382, 89 S.Ct. at 1117).

This court has concluded that, on the unique facts before it, and in the absence of any clearly controlling authority, the

---

**11.** Justice Brennan's opinion for the Court in *Burlington* thus adopts a portion of the language of his dissent in *Chicago & North Western*, in which he discussed the underlying rationale of the cases establishing an exception to the Norris–LaGuardia Act where a specific provision of the RLA is violated:

While in each of these instances the Court found specific, positive statutory mandates for judicial interference, the underlying cohesiveness of the decisions lies in the fact that in each instance the scheme of the Railway Labor Act could not begin to work without judicial involvement. That is, unless the unions fairly represented all of their employees; *unless the employer bargained with the certified representative of the employees;* unless the status quo was maintained during the entire range of bargaining, the statutory mechanism

could not hope to induce a negotiated settlement. In each case the judicial involvement was minimal and in keeping with the central theme of the Act—to bring about voluntary settlement.

(Emphasis added).

Here, the effect of the failure by the parties to seek judicial resolution of the certification controversy has prevented the employer from "bargain[ing] with the certified representative of the employees" and has derailed any possibility that the "statutory mechanism" will "induce a negotiated settlement" of *any* outstanding bargaining issues. Truly, this is a case where "the scheme of the Railway Labor Act [cannot] begin to work without judicial involvement" to enforce the specific mandate of § 152 First and enjoin the picketing.

"reasonable efforts" requirement of 45 U.S.C. § 152 First requires the Teamsters to first seek judicial enforcement of the NMB certification before it engages in primary (and secondary) actions. In so holding, the court does not, like the courts of yesteryear, substitute its idiosyncratic socioeconomic views for the policies enacted by Congress. Rather, the path taken here is an attempt to "vindicate the vital representation process," *Pan American*, 275 F.Supp. at 1000, *aff'd per curiam*, 404 F.2d 938 (2d Cir.1969), by giving effect to the statutory certification procedure and to the fundamental Congressional intent of avoiding needless interruptions of commerce in the transportation sector.

Holding that, on these facts, an injunction may issue to enforce 45 U.S.C. § 152 First will not "swallow the rule" embodied in the Norris–LaGuardia Act, *Burlington Northern*, 107 S.Ct. at 1854 n. 15, particularly in view of the fact that the judicial enforcement remedy available to the Teamsters is firmly grounded in the RLA's express requirement that employers "treat with" unions certified by the NMB. 45 U.S.C. § 152 Ninth. This is not a case like *Burlington Northern*, where the implied

prohibition against secondary picketing appeared to be manufactured out of whole cloth.

Moreover, this *is* a case in which "the scheme of the Railway Labor Act could not begin to work without judicial involvement." The record demonstrates that the mediation process provided in the RLA and invoked by the Teamsters has been rendered irrelevant by the conflict between the parties over the legal validity of the certification. The Teamsters' decision to take that conflict to the streets utterly frustrates the RLA's primary purpose of "settl[ing] strikes and avoid[ing] interruptions to commerce," *Burlington Northern*, 107 S.Ct. 1854, and is especially indefensible in view of the essentially legal nature of the dispute, and the ease with which the Teamsters could pursue their claim in court.[12]

The Supreme Court has characterized the obligation under § 152 First that the parties "exert every reasonable effort" to settle disputes without interrupting commerce as one which lies at "[t]he heart of the Railway Labor Act," *Brotherhood of Railroad Trainmen*, 394 U.S. at 377–378, 89 S.Ct. at 1114–1115. By the same token,

---

**12.** The Teamster's legal burden in obtaining judicial relief is far less onerous than Virgin's. Enforcement of an NMB certification is almost automatic in most cases—in fact, a federal court has at most a "very, very limited equitable power to *refuse* [such] enforcement," *United States v. Feaster*, 410 F.2d 1354 (5th Cir.1969), *cert. denied*, 396 U.S. 962, 90 S.Ct. 427, 24 L.Ed.2d 426 (1969) (emphasis added). In contrast, a federal court would lack jurisdiction to review Virgin's claim of improper certification unless Virgin could demonstrate that the alleged error is "of constitutional dimension or [in] gross violation of the statute." *British Airways Board v. National Mediation Board*, 685 F.2d 52, 55 (2d Cir.1982). *See also Switchmen's Union of North America v. National Mediation Board*, 320 U.S. 297, 300, 64 S.Ct. 95, 96, 88 L.Ed. 61 (1943) (certification reviewable where absence of federal jurisdiction would mean "a sacrifice or obliteration of a right which Congress had created" under the RLA); *Brotherhood of Railway & Steamship Clerks v. Association for the Benefit of Non-Contract Employees*, 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965) (certification reviewable where it is alleged that the Board breached a clear statutory duty or exceeded its statutory authority); *Russell v. National Mediation Board*, 714 F.2d 1332 (5th Cir.1983), *cert. denied*, 467 U.S.

1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *International In–Flight Catering Co. v. National Mediation Board*, 555 F.2d 712 (9th Cir.1977); *Zantop International Airlines, Inc. v. National Mediation Board*, 732 F.2d 517, 520–23 (6th Cir.1984).

As indicated at the beginning of this opinion, this is a case of first impression. Research has not disclosed an analogous fact pattern. It may be convincingly contended that by counting the ballots as it did, in seemingly complete disregard of an order of a United States District Court, the NMB plainly disregarded not only its own ballot-counting procedure but also its statutory duty. 45 U.S.C. § 152 Ninth explicitly provides, in relevant part, that

[T]he Mediation Board shall be authorized to take a secret ballot of the *employees* involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives *by the employees* ...

(Emphasis added.)

That is, in the face of the district court's order holding that certain persons had no right to reinstatement, the NMB counted the votes of those persons, who were not *employees* of the carrier.

that provision embodies a "basic command" of the RLA, the violation of which may be enjoined, even according to the opinion in *Burlington.* The Supreme Court's opinion in *Chicago & North Western* compels this court to conclude that Virgin could bring a successful action to enjoin the Teamsters' primary strike against it, and therefore that United has established a probability of success on the merits for purposes of obtaining a preliminary injunction against the secondary picketing.[13]

### B. *Irreparable Injury*

At the August 23, 1988 hearing held on plaintiff's motion for a temporary restraining order, plaintiff elicited testimony that the secondary picketing by the Teamsters was damaging United's reputation a reliable and desirable carrier of cargo. (TR 33–34). This testimony was uncontroverted and suffices to establish irreparable injury to United.

This controversy also implicates the public interest in the uninterrupted flow of interstate commerce, so that an injunction could issue even if United failed to prove irreparable harm.

### C. *Equities Tipping in United's Favor*

United is an innocent party, and a stranger to the underlying dispute between Virgin and the Teamsters. That it has been thrust, through no fault of its own, into the midst of a dispute which should have been settled judicially without any picketing strongly suggests that the equities tip in United's favor.

### CONCLUSION

In arriving at this conclusion, I remain acutely aware of the need to refrain from imposing my "self-mesmerized views of economic and social theory" upon this dispute. *Burlington Northern,* 107 S.Ct. at 1855 (quoting *Brotherhood of Railroad*

*Trainmen v. Jacksonville Terminal Co.,* 394 U.S. at 382, 89 S.Ct. at 1117). I am satisfied that I have refrained from doing so. The result reached, limited as it is to the specific facts of this case is, I believe, dictated by the purpose and intent of the RLA as those are reflected in the cases which have construed it.

SO ORDERED.

---

**13.** The continuing availability of a remedy other than direct action—*i.e.,* judicial enforcement of the certification—distinguishes the present case from those cited by the Teamsters, in which all methods of dispute resolution other than direct action had been exhausted. *See, e.g., Burlington Northern, supra; Summit Airlines, Inc. v.*

*Teamsters Local Union 295,* 628 F.2d 787 (2d Cir.1980). Even more irrelevant is *Federal Express Corp. v. Teamsters Union, Local 85,* 617 F.2d 524 (9th Cir.1980), which held only that the RLA was wholly inapplicable to govern the conduct of a union which did not purport to represent any of the carrier's employees.