**IBERIA AIR LINES OF SPAIN,**
Plaintiff,

v.

**NATIONAL MEDIATION BOARD,** International Association of Machinists and Aerospace Workers, AFL–CIO ("IAM") and IAM District Lodge No. 100, Defendants.

**UNITED STATES of America, Plaintiff,**

v.

**IBERIA AIR LINES OF SPAIN,**
Defendant.

Nos. 79 Civ. 1536, 79 Civ. 1570.

United States District Court,
S. D. New York.

June 21, 1979.

Poletti, Freidin, Prashker, Feldman & Gartner, New York City, for plaintiff and defendant Iberia Air Lines of Spain; Murray Gartner, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., Southern District of New York, New York City, for defendant National Mediation Board and plaintiff United States; Gaines Gwathmey III, Asst. U. S. Atty., New York City, of counsel.

Kevin P. Quill, Long Island City, N. Y., for defendants International Association of Machinists and Aerospace Workers, AFL–CIO, and IAM District Lodge No. 100.

## OPINION

### ROBERT J. WARD, District Judge.

Iberia Air Lines of Spain ("Iberia"), plaintiff and defendant in these two consolidated actions,[1] moves pursuant to Rule 56, Fed.R.Civ.P., for summary judgment declaring that, on February 23, 1979, it lawfully changed the rates of pay, rules, and working conditions of certain of its employees represented by the International Association of Machinists and Aerospace Workers ("IAM"). For the reasons hereinafter stated, Iberia's motion is granted.

### The Facts

Iberia is an air carrier subject to the provisions of the Railway Labor Act ("RLA" or "Act"), 45 U.S.C. §§ 151–88. The IAM is the duly recognized representative of approximately 260 Iberia employees in the United States and Puerto Rico.[2] Prior to January 1, 1976 Iberia and the IAM entered into a labor agreement ("the agreement"), effective January 1, 1976, covering the terms and conditions of employment of Iberia's IAM-represented employees. The agreement expired by its terms on December 31, 1978. On September 29, 1978, pursuant to Section 6 of the RLA,[3] Iberia and

---

1. Iberia is the plaintiff in an action against the National Mediation Board ("NMB" or "Board"), the International Association of Machinists and Aerospace Workers, AFL–CIO ("IAM"), and IAM District Lodge No. 100 ("District 100" or "local"). *Iberia Air Lines of Spain v. National Mediation Board, et al.,* 79 Civ. 1536 (S.D.N.Y., filed March 23, 1979). Iberia is the defendant in a related action brought by the United States. *United States of America v. Iberia Air Lines of Spain,* 79 Civ. 1570 (S.D.N.Y., filed March 23, 1979). On April 10, 1979, on the consent of the parties, the two actions were consolidated pursuant to Rule 42(a), Fed.R.Civ.P.

2. The IAM represents Iberia employees in the following classifications: Passenger Agent, Passenger Supervisor, Cargo Agent, Cargo Supervisor, Purchasing Clerk, Purchasing Supervisor, Operations Agent, Assistant Flight Dispatcher, Reservations Agent, Reservations Supervisor, Ticket Agent, Ticket Supervisor, Administration Agent, Lead Administration Agent, Catering Agent, Lead Catering Agent, Tariff Agent, Lead Tariff Agent, Communica-

tions System Operator/Teletype, Lead Communications System Operator/Teletype, Mail Clerk/Storeman/Courier/Chauffeur, Lead Mail Clerk/Storeman/Courier/Chauffeur, Agent, Secretaries, Switchboard Operator/Receptionist, and Utility Man Airport.

3. Section 6 of the RLA, 45 U.S.C. § 156, provides:

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not

the IAM exchanged notices of intended changes in the agreement and began negotiating a new agreement. From November 6, 1978 through February 10, 1979, the parties conducted negotiating sessions. On February 10, 1979, the negotiations became deadlocked and were terminated.

Following the deadlock of negotiations, on February 10, 1979 and again on February 13, 1979, Iberia informed its employees that in the absence of a request for mediation or further negotiation between the parties within the next ten days, i. e. by February 20, Section 6 of the RLA gave the employees the right to strike and the carrier the right to make unilateral changes in the terms and conditions of employment. On February 13, 1979 IAM District 100 inaccurately notified its members that it had invoked the NMB's mediation services. What District 100 had actually done was to mail a letter to the IAM's international headquarters in Washington, D. C. requesting that the international union invoke the NMB's mediation services on the local's behalf.[4] The request arrived at the IAM's international headquarters on Friday, February 16, 1979.

The offices of the NMB were closed on Monday, February 19, 1979, in observance of Washington's Birthday, a federal holiday. Because of a snowstorm, the Board's offices were also closed on February 20, 1979, the last day for a request for or proffer of the Board's mediation services under Section 6 of the Act. On the next day, February 21, 1979, the NMB's offices reopened. The IAM's international offices, however, were closed on both February 20 and 21, 1979.

On February 21, 22 and at approximately 12:00 noon on February 23, 1979 Iberia representatives asked the Executive Secretary of the NMB, Rowland K. Quinn, Jr., whether any request for mediation had been received in connection with the Iberia-IAM dispute. Mr. Quinn informed the Iberia representatives on each occasion that no such request had been received. The Assistant Airline Coordinator of the IAM, William L. Sheri, however, had telephoned the Board on February 22, 1979 and stated that he was filing an application for the Board's mediation services in the Iberia-IAM dispute.

Since neither party had requested the mediation services of the NMB within ten days of the termination of conferences, Iberia announced at 11:00 A.M. on February 23, 1979 that it was placing into effect the rates of pay, rules and working conditions which it had proposed to the IAM during their unsuccessful negotiations. Later that day, Iberia notified the NMB's Executive Secretary that it had placed the changes into effect.

Several hours after instituting these changes and notifying all the parties, Iberia was informed by the NMB that it had received an IAM request for mediation at 11:08 A.M. that morning and that the envelope containing the application had been sent the day before, on February 22, 1979. A subsequent letter from the NMB formally advised Iberia that the Board had received the IAM's application and that it had docketed the application as NMB Case No. A–10395. In spite of the fact that the NMB had not received the application within the statutory ten-day period set forth in Section 6 of the Act, the NMB's docketing letter further advised that a mediator would be assigned to the dispute and "reminded [the parties] of the status quo provisions of the Railway Labor Act."

On February 27, 1979, Iberia advised the Board that it considered the IAM application for mediation as untimely and ineffective to require the restoration of the rates of pay and working conditions which were in effect prior to February 23, 1979. Iberia also advised the NMB that it did not regard

---

be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

4. Under the IAM's internal operating procedures only the international union has the authority to invoke mediation.

the Board as having jurisdiction to mediate the dispute. The NMB responded on March 14, 1979 that it believed the case was properly docketed and that Iberia was obligated to restore the conditions which were in effect prior to February 23, 1979.

The NMB's mediator appeared at Iberia's offices on March 19, 1979 to begin mediation of the IAM–Iberia dispute. Refusing to meet with the mediator, Iberia's representatives restated the carrier's position that, while it remained willing to discuss incorporating the February 23 rules into an agreement with the IAM, it would decline to meet with the NMB mediator under conditions which would activate the status quo provisions of the Act.

On March 23, 1979 Iberia commenced the instant action for a declaratory judgment against the NMB and the IAM.[5] Later that day, the United States ("the government") commenced the related action for injunctive and declaratory relief against Iberia.[6] On April 2, 1979 by order to show cause, Iberia moved, *inter alia,* for summary judgment. The government, on April 6, 1979, cross-moved pursuant to Rule 65, Fed.R.Civ.P., for a preliminary injunction directing Iberia to restore the pre-February 23, 1979 working conditions and to participate in mediation before the NMB. On April 18, 1979 the government withdrew its motion for a preliminary injunction.

The sole issue presented on Iberia's motion for summary judgment is one of statutory construction. The government contends that the Act should be interpreted to require that the status quo be maintained not only during the ten-day period express-

ly provided in Section 6, but during any subsequent period if the request for mediation is made after the expiration of the ten-day period, but before a change in the status quo. Alternatively, the government contends that the ten-day statutory period was tolled for two days through February 22, 1979 because a snowstorm prevented the IAM from opening its Washington, D. C. offices on February 20 and 21, 1979. Iberia contends that Section 6 of the Act explicitly allows a carrier to change the rates, rules, and working conditions of its employees when ten days have elapsed after termination of conferences without request for or proffer of the NMB's mediation services.

*Discussion*

■ Section 2, Seventh of the Railway Labor Act, 45 U.S.C. § 152, Seventh, states:

No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

Section 6 of the Act, 45 U.S.C. § 156, in turn, expressly prohibits changes by the carrier:

until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

Section 6 of the Act, therefore, refers to Section 5[7] as the provision under which the

---

5. Iberia's complaint seeks (1) a declaration that the IAM's request for mediation made after the expiration of the statutory ten-day period was ineffective to invoke the NMB's jurisdiction under Section 5, First of the Act or to call into effect the status quo provisions of Section 6 and that Iberia lawfully changed the rates of pay, rules and working conditions for Iberia employees represented by the IAM on February 23, 1979 and (2) a direction that the NMB terminate its mediation of the dispute between Iberia and the IAM.

6. The government's complaint seeks (1) a declaratory judgment that Iberia violated the sta-

tus quo provisions of the Act by changing on February 23, 1979 the rates of pay, rules and working conditions for its IAM-represented employees, and (2) an injunction against Iberia's "changing, not preserving or not maintaining" the working conditions prior to February 23, 1979.

7. Section 5, First of the RLA, 45 U.S.C. § 155, First, provides:

The parties, or either party, to a dispute between an employee or group of employees and a carrier may invoke the services of the Mediation Board in any of the following cases:

NMB is to mediate a dispute "unless a period of ten days has elapsed after termination of conferences" without invocation of the Board's services. Absent a request for or proffer of mediation within that ten-day period, the carrier is free under the terms of the Act to change the rates, rules, and working conditions of its employees.

In spite of the apparently unequivocal language of Section 2, Seventh and Section 6 of the Act, the government contends that the statute should be construed to require reinstitution of the status quo whenever one party invokes mediation prior to a change in the status quo by the other, even after the expiration of the ten-day period. This construction of Section 6, the government urges, is the only one which advances the self-evident purpose of the Act to allow mediation and the Act's other procedures to play a significant role in the resolution of labor disputes prior to the parties' resort to economic self-help. The Court finds no merit in the government's contention.

Although mediation by the NMB unquestionably occupies a central place in the elaborate scheme established by the Railway Labor Act for the resolution of disputes involving changes in rates of pay, rules or working conditions, *see e. g., Chicago and North Western Railway Company v. United Transportation Union,* 471 F.2d 366, 369 (7th Cir. 1972), the provisions of the Act itself clearly envisage two possible courses of action open to the parties to a dispute. The first involves the successive steps of conferences, compulsory mediation, and a 30-day cooling off period, with the additional possibility of an Emergency Board; the second involves conferences, followed by freedom of action of the parties, if no request for mediation is made within ten days after the termination of conferences. By accepting the government's interpretation of the Act, that a request for mediation after the ten-day period can nevertheless activate the status quo requirement of Section 6, this Court would be writing out of the statute the very condition which excuses the carrier from its obligation not to alter conditions—the lapse of ten days after the termination of conferences without invocation of the NMB's services. Such an interpretation would, moreover, frustrate the obvious purpose of the limited status quo provisions of Sections 5 and 6, the preservation of the ultimate right of the parties, implicit in the statutory scheme, to resort to economic self-help. *See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969); *Florida East Coast Ry. Co. v. Brotherhood of Railroad Trainmen,* 336 F.2d 172, 181 (5th Cir. 1964), *cert. denied,* 379 U.S. 990, 85 S.Ct. 703, 13 L.Ed.2d 611 (1965).

■ Nor is the government's position buttressed by the NMB's interpretation of Section 6's status quo provisions or the NMB's action in docketing the Iberia—IAM dispute and assigning a mediator. As the Supreme Court stated in *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union,* 396 U.S. 142, 158–59, 90 S.Ct.

(a) A dispute concerning changes in rates of pay, rules, or working conditions not adjusted by the parties in conference.

(b) Any other dispute not referable to the National Railroad Adjustment Board and not adjusted in conference between the parties or where conferences are refused.

The Mediation Board may proffer its services in case any labor emergency is found by it to exist at any time.

In either event the said Board shall promptly put itself in communication with the parties to such controversy, and shall use its best efforts, by mediation, to bring them to ‚ agreement. If such efforts to bring about an amicable settlement through mediation shall be unsuccessful, the said Board shall at once endeavor as its final required action (except as provided in paragraph third of this section and in section 160 of this title) to induce the parties to submit their controversy to arbitration, in accordance with the provisions of this chapter.

If arbitration at the request of the Board shall be refused by one or both parties, the Board shall at once notify both parties in writing that its mediatory efforts have failed and for thirty days thereafter, unless in the intervening period the parties agree to arbitration or an emergency board shall be created under section 160 of this title, no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose.

294, 304, 24 L.Ed.2d 325 (1969), the NMB has no authority to interpret Section 6 of the Act:

[T]he Mediation Board has no adjudicatory authority with regard to major disputes, nor has it a mandate to issue regulations construing the Act generally. Certainly there is nothing in the Act which can be interpreted as giving the Mediation Board the power to change the plain, literal meaning of the statute, which would be the result were we to adopt its interpretation of § 6.

*See also Chicago & North Western Railway Co. v. United Transportation Union,* 402 U.S. 570, 581, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971).

Similarly without significance is the Board's docketing of the IAM's untimely application for mediation and assignment of a mediator. As the Court stated in *Pan American World Airways, Inc. v. International Brotherhood of Teamsters,* 275 F.Supp. 986, 995 (S.D.N.Y.1967), *aff'd per curiam on opinion below sub nom. Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employes v. Pan American World Airways, Inc.,* 404 F.2d 938 (2d Cir. 1969), in the context of declaring that a carrier would violate the Act if it negotiated a new agreement with an incumbent union while a representation proceeding involving a rival union was pending before the NMB, despite the fact that the NMB had proffered mediation between the carrier and the incumbent union:

[T]he proffer of the Board, presumably under § 5, First, to mediate the immediate dispute between the Clerks Union and

Pan Am, signalled by the Clerks strike call, does not furnish any bar to the granting of the declaratory relief sought. Assuming that the Board had the power under § 5, First, to undertake mediation of a dispute of this character, the mediation proceedings are designed merely to bring the parties to an agreement. In such mediation the Board performs no such adjudicative function and is not called upon to, and indeed could not make a binding determination of the question of law at issue between the parties which is the core of the dispute.

The Court therefore rejects the government's invitation to construe the Act in clear derogation of its express statutory language.

■ The Court finds the government's [8] alternative contention equally unpersuasive. The essence of this argument is that the ten-day period set forth in Section 6 of the Act should be deemed tolled for two days through February 22, 1979 because the IAM was prevented by a snowstorm from opening its Washington offices on February 20 and 21. The government further argues that IAM's telephone request on February 22, 1979 should be deemed sufficient invocation of the NMB's services as of that date.

The undisputed facts clearly establish that the snowstorm on February 19 and 20, 1979 did not prevent the NMB from opening its offices on February 21, 1979. It is also clear that the IAM cannot credibly claim to have been unaware that if it wanted effectively to invoke the NMB's mediation services it had to make the request within the ten-day statutory period ending February 20, 1979.[9] Nor can the IAM cred-

---

**8.** District 100 of the IAM joins the government in this contention. For the purposes of this opinion, the Court will refer to it simply as "the government's contention."

**9.** Indeed, the IAM's own pamphlet explaining the procedures of the Act to its employees, entitled "Eleven Procedural Steps to Agreement (Required by the Railway Labor Act, as amended)", states:

STEP III

(a) If the parties "deadlock" or "break-off" negotiations either party may elect during a ten (10) day status-quo period to engage the

services of the National Mediation Board. Notification to engage the services of the Board must be made by either or both parties during the ten (10) day status-quo period in writing.

(b) If neither the Company nor the Union request the services of the National Mediation Board, the Board may and can intercede and force the parties into Mediation if it so desires.

(c) If neither the Company nor the Union, or the National Mediation Board request the services of the Board, the parties are free of any legal restraint.

ibly claim that it was unaware that the ninth day of that ten-day period, February 19, was a federal holiday. Under these circumstances the Court finds no basis for tolling the statutory period beyond February 21, 1979.

■ Moreover, even if the statutory period were tolled through February 22 there is no support for the government's contention that the IAM's telephone call on February 22 constituted effective invocation of the NMB's services. Any argument that a telephone conversation with a subordinate union officer constitutes invocation of mediation is belied by the NMB's own regulation which specifies that a request is to be made on Form NMB–2 in duplicate and that the form is to be signed by the "highest officer of the carrier" or by the "chief executive of the labor organization." [10]

Furthermore, even if a telephone conversation could constitute effective invocation of the NMB's mediation services, there is simply no factual support for the government's assertion that the IAM requested these services by telephone on February 22, 1979. The deposition and affidavit testimony of both parties to the conversation, Mr. Quinn of the NMB and Mr. Sheri of the IAM, establishes that neither party considered the call an effective invocation of the Board's services. Mr. Quinn stated that

Mr. Sheri only advised him "that he was mailing the application for mediation." Similarly, Mr. Sheri stated in his affidavit that he merely told Mr. Quinn that he was "filing the [a]pplication for [m]ediation [s]ervices." Both parties to the telephone conversation in which the government now contends the NMB's mediation services were invoked thus agree that the NMB was merely informed that a request for such services was being forwarded.

■ The deposition testimony of Mr. Quinn also establishes that he took no action on February 22 to docket a request for mediation in the Iberia-IAM dispute or to indicate that the NMB's services had been invoked.[11] Mr. Quinn testified that it was only after the IAM's written application was received in the NMB's offices on February 23, 1979, that the Board members were informed and the matter docketed. In light of these undisputed facts, the Court rejects the government's contention that the NMB's services were duly invoked during Mr. Sheri's telephone call to Mr. Quinn on February 22, 1979 and concludes that the effective filing of the request for the Board's services occurred on February 23, 1979, beyond the ten-day period, even allowing for a two-day tolling because of the snowstorm.[12]

---

10. Section 1203.1 of the NMB's Rules and Regulations, 29 C.F.R. § 1203.1 (1978), provides:
   Applications for the mediation services of the National Mediation Board under section 5, First, of the Railway Labor Act, may be made on printed forms N.M.B. 2, copies of which may be secured from the Board's Secretary. Such applications and all correspondence connected therewith should be submitted in duplicate. The application should show the exact nature of the dispute, the number of employees involved, name of the carrier and name of the labor organization, date of agreement between the parties, if any, date and copy of notice served by the invoking party to the other and date of final conference between the parties. Application should be signed by the highest officer of the carrier who has been designated to handle disputes under the Railway Labor Act, or by the chief executive of the labor organization, whichever party files the application. These applications, after preliminary investigation in the Board's officer [sic], are given docket number in series "A" and the cases are as-

signed for mediation to Board members or to mediators on the Board's staff.

11. Q Did you do anything involving or affecting Iberia Air Lines after you received that telephone conversation? . . . on the 22nd.
A No, I did nothing involving Iberia Air Lines on that date after that telephone conversation.
Q You didn't, for example, docket a request for mediation on the 22nd?
A No.
Q You did not docket any case involving Iberia Air Lines after that telephone conversation?
A On the 22nd, no, I didn't.
Q On the 22nd. All right. Did you notify anybody representing Iberia Air Lines about that telephone conversation on the 22nd?
A. No, I did not.
Deposition of Rowland K. Quinn, Jr., April 12, 1979, pp. 9–10.

12. The government's additional contention that the *mailing* of the application on February 22 constituted effective invocation of mediation must also be rejected. The general rule, followed in numerous cases under the National

Accordingly, Iberia's motion for summary judgment declaring that it lawfully changed the rates of pay, rules, and working conditions of its employees represented by the IAM on February 23, 1979, as permitted by Section 6 of the Railway Labor Act, in the absence of a request for mediation within the statutory ten-day period, is granted.

Settle judgment on notice.

Labor Relations Act, is that written notice is effective when received, not when placed in the mail. *N.L.R.B. v. Vapor Recovery Systems Company,* 311 F.2d 782, 785 (9th Cir. 1962) (notice of intention to terminate existing agreement); *Booster Lodge No. 405, International Association of Machinists and Aerospace Workers, AFL–CIO v. N.L.R.B.,* 148 U.S.App. D.C. 119, 128, 459 F.2d 1143, 1154 & n. 21

(1972) *aff'd per curiam,* 412 U.S. 84, 93 S.Ct. 1961, 36 L.Ed.2d 764 (1973) (notice of resignation from union). *See also N.L.R.B. v. Acme Wire Works, Inc.,* 582 F.2d 153, 157 (2d Cir. 1978) (notice of withdrawal from multi-employer bargaining unit). The Court finds no basis for the application of a different rule in the instant case.