UNITED TRANSPORTATION
UNION, Plaintiff,

v.

DELAWARE AND HUDSON RAILWAY,
CO., and National Mediation Board,
Defendants.

No. 96–CV–1762.

United States District Court,
N.D. New York.

Aug. 1, 1997.

Gleason, Dunn, Walsh & O'Shea, Mark T. Walsh, of counsel, Albany, NY, for Plaintiff.

CP Legal Services, Timothy G. Mulcahy, of counsel, Clifton Park, NY and Sidley & Austin, Krista L. Edwards, of counsel, Washington, D.C., for Defendant Delaware & Hudson Railway.

U.S. Dep't of Justice, Theodore C. Hirt, Civil Division, of counsel, Washington, DC, for Defendant National Mediation Board.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

### I. BACKGROUND

This case arises from the breakdown of negotiations between United Transportation Union ("UTU") and Delaware & Hudson Railway Company ("D & H") concerning a collective bargaining agreement. The second named defendant, National Mediation Board ("NMB"), is involved because it is attempting to force the parties to engage in statutorily required mediation. UTU seeks declaratory and injunctive relief pursuant to the Railway Labor Act, 45 U.S.C. § 151 *et seq.*

Essentially, what is at issue is whether UTU properly terminated contract negotiations such that D & H was on notice that it had to request mediation by the NMB within the 10 days required by the Railway Labor Act ("RLA" or "the Act"). If D & H failed to request mediation within 10 days of termination of negotiations, then UTU argues that it is entitled to self-help: i.e., strike. If UTU did not terminate negotiations properly, then under the RLA it cannot strike and must either continue to negotiate or take part in mediation with the NMB. *See* 45 U.S.C. § 156.

UTU, which represents some of D & H's railway workers, entered into a collective bargaining agreement with D & H in 1990 and again in 1992 under the terms of the Railway Labor Act. On November 6, 1994, UTU served notice to D & H that it wished to make changes to the agreement. Under the RLA, specific notice is required to invoke the RLA's change provisions. *See* 45 U.S.C. § 156 (also referred to as "Section 6 Notice"). On July 28, 1996, D & H served its Section 6 Notice as well.

From December 8, 1994 through August 1, 1996, the parties formally conducted negotiation sessions, which the RLA calls "conferences." At the August 1, 1996 negotiation conference, UTU Vice–President Robert W. Earley claims that he "verbally terminated the negotiation conferences." (Early Supple-

mental Aff. ¶ 7). Earley alleges that this was acknowledged by a D & H representative. (*Id.*). However, D & H asserts that "[a]t the conclusion of the session, Mr. Earley told us that UTU was open to another proposal from D & H." (Brazier Aff. ¶ 12).

On August 15, 1996, UTU wrote D & H indicating that UTU believed conferences had been terminated on August 1, 1996, that ten days had run since that time, and thus UTU was entitled to self-help. (Brazier Aff., Ex. 1 ("August 15 Letter")). However, in that same letter UTU also requested further negotiations, albeit with the disclaimer that UTU still considered itself entitled to exercise self-help. D & H responded to UTU's August 15 Letter with a letter of its own that stated that UTU did not have the right to exercise self-help and asking for further negotiations. (Brazier Aff., Ex. 2). On September 4, 1996, UTU sent another letter to D & H stating that its August 15 Letter had terminated conferences and that UTU was entitled to self-help. (Brazier Aff., Ex. 3). However, UTU's September 4 letter again requested additional conferences.

On September 20, 1996, the parties met to negotiate and on that same date D & H sent a letter to UTU stating that the union had breached its duty to bargain in good faith. The parties met for the last time on October 4, 1996. Also on October 4, 1996, D & H filed an application for mediation with the NMB. As a result, a mediator was assigned and attempts to mediate were begun by NMB. On October 8, 1996, UTU notified NMB that it would not engage in mediation and that it believed the NMB lacked jurisdiction.

On November 6, 1996, UTU filed the instant Complaint seeking a declaration that D & H's request to the NMB had occurred more than 10 days after termination of conferences and requesting an injunction preventing the NMB from forcing UTU to mediate, thereby allowing UTU to exercise self-help. On November 27, 1996, UTU filed a Motion for Preliminary Injunction seeking to enjoin the NMB from forcing UTU to mediate. On January 14, 1997, this Court denied UTU's motion.

Presently before the Court is plaintiff UTU's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## II. DISCUSSION

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may grant summary judgment if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). It is the substantive law that will determine what facts are material to the outcome of a case. *See Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

Initially, the moving party has the burden of informing the court of the basis of its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The Court must then resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). However, the non-moving party must do more than simply show "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. Only when the Court concludes that no rational finder of fact can find in favor of the non-moving party should summary judgment be granted. *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223 (2d Cir.1994).

Here, both defendants oppose Plaintiff's motion and each has filed a separate memorandum of law in opposition. NMB opposes UTU's motion on the basis that: (1) Congressional intent reveals that the Railway Labor Act requires mutual and unequivocal termination of conferences, and (2) there is no evidence here of mutual termination of conferences. D & H opposes UTU's motion on the basis that: (1) there is no evidence

here of unequivocal termination of conferences, and (2) UTU failed to bargain in good faith.

The Court will address Defendants' arguments *seriatim.*

### A. Statutory Background

The RLA establishes multiple levels of formal dispute resolution procedures and limits the parties' ability to alter the status quo by self-help throughout the resolution process. First, if a party intends to alter "agreements affecting rates of pay, rules or working conditions," the party must "give at least thirty days' written notice" of the proposed changes. 45 U.S.C. § 156 (called "Section 6 Notice"). The parties then meet in negotiating conferences to discuss these proposals. 45 U.S.C. § 152. If the parties in conference fail to agree, "either party ... may invoke the services of the [NMB]." 45 U.S.C. § 155. In addition, the NMB "may proffer its services in case any labor emergency is found by it to exist at any time." 45 U.S.C. § 155(b).

Once a party has given notice of intended changes, and through the ensuing negotiations and mediation, neither party may change the status quo through self-help. 45 U.S.C. § 156. For example, carriers cannot decrease salaries and employees cannot strike. No party can seek self-help "unless a period of ten days has elapsed after termination of conferences without request for, or proffer of, the services of the [NMB]." 45 U.S.C. § 156.

Finally, if NMB–administered mediation is employed, but that mediation fails, the NMB "shall at once endeavor ... to induce the parties to submit their controversy to arbitration." 45 U.S.C. § 155. If either party refuses to arbitrate, again the parties must wait 30 days before altering the status quo. 45 U.S.C. § 155.

### B. Mutual Termination of Conferences under the RLA

Defendant National Mediation Board argues that the Railroad Labor Act requires *mutual* and unequivocal termination of conferences before a party may exercise self-

help. While there is no disagreement between the parties that the RLA requires unequivocal termination, UTU opposes NMB's assertion that the RLA requires mutual termination.

Section 6 of the RLA expressly prohibits changes by the carrier

> until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed *after termination of conferences* without request for or proffer of the services of the Mediation Board.

45 U.S.C. § 156 (emphasis added).

NMB concedes that the RLA itself is silent as to how conferences are to be terminated. Nevertheless, NMB argues that the RLA's purposes and provisions, as well as its legislative history indicate that *mutual* and unequivocal termination of conferences is required before either party may exercise self-help. First, NMB argues that the RLA's provisions must be interpreted in light of the Act's primary objective, which is the prevention of strikes. NMB cites extensive case law supporting the proposition that the RLA's purpose is to maintain the status quo and that the Act gives "to the parties and to representatives of the public [the power] to make the exhaustion of the Act's remedies an almost interminable process." *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 149, 90 S.Ct. 294, 299, 24 L.Ed.2d 325 (1969).

NMB also asserts that the legislative history of the RLA manifests Congress' intent that conferences be terminated only by mutual, unambiguous communication. NMB again concedes, however, that the RLA's legislative history casts little light on the meaning of "termination of conferences." Instead, NMB argues that the need for mutual termination should be inferred because "Congress did not mention termination of conferences as an alternative to the prolonged machinery

of the RLA" and thus NMB warns that "[u]nilateral and equivocal termination . . . would allow the parties to evade the Act's procedures without exhausting the possibilities of negotiations, let alone of mediation, arbitration, and conciliation." (NMB's Mem. of Law at 16).

Finally, NMB argues that mutual termination should be required here because the NMB's interpretation of the RLA is entitled to deference. While the NMB is correct that an agency's interpretation of an ambiguous statute is entitled to deference, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), a court is not merely a rubber stamp. Under *Chevron*, the interpretation of an ambiguous statute by an agency that is authorized by Congress to *promulgate rules* under the statute is to be upheld if it is a reasonable one. *Id.*

However, NMB's interpretation of the RLA is not entitled to the generous treatment afforded agency interpretations under *Chevron*. The NMB has not been granted rule-making authority by Congress. As the Supreme Court stated in *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969):

> [T]he Mediation Board has no adjudicatory authority with regard to major disputes, nor has it a mandate to issue regulations construing the Act generally. Certainly there is nothing in the Act which can be interpreted as giving the Mediation Board the power to change the plain, literal meaning of the statute, which would be the result were we to adopt its interpretation of § 6.

*Id.* at 158–59, 90 S.Ct. at 304.

The *Chevron* court made clear that only statutory interpretations by agencies with rule-making powers deserve substantial deference.[1] *Chevron*, 467 U.S. at 841–44, 104 S.Ct. at 2781–83. "The principal rationale

---

1. When an agency has rulemaking authority its discretion is circumscribed; the Administrative Procedure Act ("APA") establishes certain procedures that the agency must follow. Chief among them is the notice-and-comment provision of the APA. 5 U.S.C. § 553. This rule-making process bears some resemblance to the legislative process and serves to temper the resultant rules such that they are likely to withstand vigorous scrutiny. "It is this notice-and-comment process that entitles the administrative rules to judicial deference." *Atchison*, 44 F.3d at 442.

underlying this deference is that in [the rule-making] context the agency acts as a congressional proxy; Congress develops the statutory framework and directs the agency to flesh out the operational details." *Atchison Topeka and Santa Fe Ry. Co. v. Pena*, 44 F.3d 437, 442 (7th Cir.1994), *aff'd*, —— U.S. ——, 116 S.Ct. 595, 133 L.Ed.2d 535 (1996).

In contrast, when the agency does not have rule-making authority, the agency's application of statutory provisions is, at most, considered "interpretive rules." 5 U.S.C. § 553(d)(2).[2] This is not to say that the NMB's interpretation, while undeserving of substantial deference under *Chevron*, does not warrant any deference from this Court. In an analogous context, the Second Circuit examined an Equal Employment Opportunity Commission ("EEOC") interpretation of Title VII, concluding:

> The EEOC is the agency charged by Congress with the interpretation, administration, and enforcement of Title VII. Unlike many other federal agencies, however, the EEOC does not have the power to promulgate rules or regulations with respect to Title VII. Thus, the weight accorded a particular EEOC guideline or interpretation with respect to Title VII depends upon the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Ultimately, EEOC statements of policy "should always be considered, but they should not be regarded as conclusive unless reason and statutory interpretation support their conclusion."

*Yerdon v. Henry*, 91 F.3d 370, 376 (2d Cir. 1996) (internal citations omitted) (*quoting General Elec. Co. v. Gilbert*, 429 U.S. 125, 141–43, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976) and *Guardians Ass'n v. Civil Serv. Comm'n*, 630 F.2d 79, 91 (2d Cir.1980)).

Accordingly, the persuasiveness of NMB's interpretation of the RLA depends on the thoroughness evident in its consideration, the validity of its reasoning, and its consistency with earlier and later pronouncements on the act. In considering these factors, the Court notes that it could not find any instance where the NMB's present interpretation was ever announced or published. Moreover, the NMB provides no citation to any such pronouncement.

Furthermore, although the RLA evidences a preference for resolution of disputes through mediation rather than through self-help, no court has specifically interpreted the RLA to require mutual termination of conferences. The only case that NMB cites in support of its interpretation is *Iberia Air Lines of Spain v. National Mediation Board*, 472 F.Supp. 104 (S.D.N.Y.1979), *aff'd*, 636 F.2d 1201 (2d Cir.1980). However, the opinion in *Iberia* does not document the acts that led to termination nor does it address what acts are necessary to terminate conferences. Instead, the court in *Iberia* simply accepted the plaintiff's uncontested position that conferences had terminated. Moreover, *Iberia* appears to undercut the NMB's current argument. In *Iberia*, the NMB asserted that a request for mediation after the ten-day period should nevertheless activate the status quo requirement of Section 6. The *Iberia* court rejected NMB's interpretation, noting:

> Although mediation by the NMB unquestionably occupies a central place in the elaborate scheme established by the Railway Labor Act ... the provisions of the Act itself clearly envisage two possible courses of action open to the parties to a dispute. The first involves the successive steps of conferences, compulsory mediation, and a 30–day cooling off period ...; the second involves conferences, followed by freedom of action of the parties, if no request for mediation is made within ten days after the termination of conferences. By accepting the government's interpretation of the Act, that a request for mediation after the ten-day period can nevertheless activate the sta-

---

**2.** These "interpretive rules" are treated differently by the APA. They are exempt from the notice-and-comment requirements of rule-making. 5 U.S.C. § 553(d)(2). In addition, interested parties do not have the right to petition the agency for review of its interpretive rulings as they do with respect to agency rules. *See* 5 U.S.C. § 553(e).

tus quo requirement of Section 6, this Court would be writing out of the statute the very condition which excuses the carrier from its obligation not to alter conditions.... Such an interpretation would, moreover, frustrate the obvious purpose of the limited status quo provisions of Sections 5 and 6, the preservation of the ultimate right of the parties, implicit in the statutory scheme, to resort to economic self-help.

*Iberia,* 472 F.Supp. at 108 (*citing Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969) and *Florida East Coast Ry. Co. v. Brotherhood of Railroad Trainmen,* 336 F.2d 172, 181 (5th Cir.1964)).

Similarly, NMB's position here, that mutual termination is required, would abrogate an important right preserved by the RLA—the right to self-help. NMB acknowledges this fact in its Memorandum of Law: "UTU suggests that this interpretation of the Act allows one party to force the other to remain at the negotiating table. This is precisely the point." (NMB's Mem. of Law at 11). In *Iberia,* the court rejected an NMB interpretation that sought to do the same thing, remarking that "[s]uch an interpretation would, moreover, frustrate the obvious purpose of the limited status quo provisions of Sections 5 and 6, the preservation of the ultimate right of the parties, implicit in the statutory scheme, to resort to economic self-help." 472 F.Supp. at 108.

The lack of case law in support of NMB's position may also be due, at least in part, to the fact that NMB's fears concerning unilateral termination are unfounded. As NMB itself recognizes, the RLA requires that the parties make every reasonable effort to reach an agreement. This requirement of good faith negotiation should allay most of the NMB's fears that the negotiation requirements of the RLA will simply become an empty shell. NMB incorrectly implies that unilateral termination of conferences will allow the RLA's extensive machinery to be bypassed. However, because the good faith duty "precludes [a party] from sitting in silence until the statutory period [has] run and then relying on the statutory authorization to resort to self-help," *Railway Labor Executives Assoc. v. Boston & Maine Corp.,* 664 F.Supp. 605, 611 (D.Me.1987), a unilateral decision to terminate conferences cannot automatically result in self-help; the other party need only exercise its statutory right to seek mediation.

Accordingly, the Court must conclude that mutual termination is not necessary to effectuate the purposes of the RLA. In fact, NMB's interpretation is arguably contrary to the ordinary and plain meaning of the phrase "termination of conferences," *see Lynch v. Alworth–Stephens Co,* 267 U.S. 364, 370–73, 45 S.Ct. 274, 276, 69 L.Ed. 660 (1925) ("the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover"). Furthermore, NMB's interpretation appears to be in conflict with the RLA's preservation of the right to self-help. *Iberia,* 472 F.Supp. at 108. If Congress wished to require mutual termination of conferences under the RLA, it certainly could have added the modifier "mutual" before the term "termination." Absent this express requirement in the RLA, this Court will not create one now.

## C. Unequivocal Termination of Conferences

Although the RLA does not require mutual termination of conferences, the RLA's duty to exert every reasonable effort embraces an obligation to inform the opposing party unequivocally that one considers conferences to be terminated. As one court has stated, this statutory duty "precludes [a party] from sitting in silence until the statutory period [has] run and then relying on the statutory authorization to resort to self-help." *Railway Labor Executives' Assoc.,* 664 F.Supp. at 611. Absent a clear and unequivocal communication of a party's termination, the remaining parties, and a reviewing court, will be unable to determine if the ten day period required to request mediation has run.

Here, UTU asserts that at the August 1, 1996 conference, UTU Vice–President Robert W. Earley "verbally terminated the negotiation conferences." (Early Supplemental Aff. ¶ 7). Earley alleges that his statement was acknowledged by a D & H representative. (*Id.*). In opposition, D & H states that "[a]t the conclusion of the session, Mr. Earley told us that UTU was open to another proposal from D & H." (Brazier Aff. ¶ 12). In addition, D & H supplies affidavits from three participants at the August 1, 1996 conference who state that words such as "terminated," "impasse," or "deadlock" were never mentioned at the meeting. (Brazier Aff. ¶¶ 15–16; Nooyen Aff. ¶ 16; Koch Aff. ¶ 4).

As to UTU's letter dated August 15, 1996, wherein UTU wrote D & H indicating that UTU believed conferences had been terminated on August 1, 1996, UTU *requested further negotiations.* (Brazier Aff., Ex. 1). Furthermore, the August 15 letter does not mention "termination of conferences," but merely states that "no need exist[s] for further negotiations." (*Id.*). If UTU actually meant to imply that further negotiations were unwarranted, it seems illogical for UTU to have contemporaneously requested further negotiations.

On September 4, 1996, UTU sent another letter to D & H stating that its August 15 Letter had terminated conferences and that UTU was entitled to self-help. (Brazier Aff., Ex. 3). However, UTU's September 4 letter again requested additional conferences, even acknowledging the parties' scheduled September 20, 1996 meeting. (*Id.*).

A factfinder could certainly conclude that UTU's series of letters were a form of "posturing" intended to improve its negotiating position rather than an unequivocal termination of conferences. Moreover, UTU's continued requests for further negotiations belies its claim that D & H should have been on clear notice that conferences had terminated. Accordingly, Defendants have demonstrated that a genuine issue of material fact exists as to whether conferences were terminated.

### D. Duty to Bargain in Good Faith

▮▮ Under section 152 of the RLA, carriers and unions have a duty "to exert every reasonable effort to make and maintain agreements." 45 U.S.C. § 152 First. This duty is "the heart of the Railway Labor Act." *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 377–78, 89 S.Ct. 1109, 1114–15, 22 L.Ed.2d 344 (1969). In *Chicago & N.W. Ry. v. United Transp. Union,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971), the Court noted that compliance with this duty is a prerequisite to self-help because "compliance with the formal procedures of the Act is meaningless if one party goes through the motions with a 'desire not reach an agreement.'" 402 U.S. at 578, 91 S.Ct. at 1736. Consequently, even if UTU unequivocally terminated conferences it may still be precluded from exercising self-help if it failed to bargain in good faith.

Here, UTU itself states that it "terminated conferences" after D & H rejected "UTU's final offer." (UTU Mem. of Law at 3). This form of "negotiation" calls into question whether UTU exerted every reasonable effort to reach an agreement. As a number of courts have stated, "[i]t is not a genuine negotiation to indicate that the other party has no choice except to accept the offer or accede to the demand." *Atlantic Coast Line R.R. v. Brotherhood of R.R. Trainmen,* 262 F.Supp. 177, 183 (D.D.C.), *aff'd in part and rev'd in part on other grounds,* 383 F.2d 225 (D.C.Cir.1967) ("The service of an ultimatum does not constitute negotiation"); *see also Chicago & N.W. Ry. v. United Transp. Union,* 330 F.Supp. 646, 650 (N.D.Ill.1971) (finding "take-it-or-leave-it" bargaining style violates statutory duty).

Accordingly, the Court must conclude that a genuine issue of material fact exists as to whether UTU exerted every reasonable effort to reach an agreement.

### III. CONCLUSION

In summary, the Court holds that the RLA does not require mutual termination of conferences before a party may exercise self-help. However, the Court finds that a genuine issue of material fact exists as to whether UTU unequivocally terminated conferences.

Furthermore, the Court finds that a genuine issue of material fact exists as to whether UTU bargained in good faith.

It is therefore **ORDERED** that Plaintiff's Motion for Summary Judgment is DENIED in its entirety.

**IT IS SO ORDERED.**